[Crim. No. 7151. In Bank. Mar. 14, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. CLARENCE E. ASHLEY, Defendant and Appellant.

340

Clarence E. Ashley, in pro. per., and Ben Curry, under appointment by the Supreme Court, for Defendant and Appellant.

Stanley Mosk, Attorney General, Doris H. Maier, Assistant Attorney General, and Edsel W. Haws, Deputy Attorney General, for Plaintiff and Respondent.

PETERS, J.—Defendant was found guilty of the kidnaping and the first degree murder of Angie Mae Stewart, a six-year-old girl. The same jury also determined that defendant was sane on August 8, 1960, the date the offenses were committed, and that the penalty for the murder should be death. The appeal is automatic under the provisions of section 1239, subdivision (b), of the Penal Code.

The facts are not in dispute. Angie was kidnaped and killed on August 8, 1960. She and her family (father and mother and two brothers) had arrived in Merced County by automobile on August 6, 1960, having come from Minnesota, hoping to secure farm work. They camped at Fremont Park on the San Joaquin River, some 10 miles from Gustine in Merced County.

On August 7, 1960, around 4 p.m. Angie and her nine-year-old brother were swimming in the river. When the parents went to get the children they found the appellant in the water with them. Defendant suggested that the parents also come in swimming, and they did. A short time later defendant carried Angie up the bank to his car where he got an army blanket and wrapped it around the girl and himself, in which position they remained for about 30 minutes. Defendant then discovered that the Stewarts were short of food. He suggested that they eat together, and contributed most of the food. He also went to a nearby store and purchased several cartons of beer, and some soft drinks for the children. Mr. Stewart and defendant consumed the beer except for one can which Mrs. Stewart partially drank. After dinner Angie complained of a stomach-ache. Defendant became quite disturbed and insisted on taking the girl to Gustine to see a doctor, and offered to pay the bill. The entire group drove to Gustine in defendant's car. A doctor was

located who found the ailment to be minor and prescribed for it. Defendant paid the doctor's bill, and then invited the group to a nearby bar. The defendant and Mr. Stewart had two beers, and Mrs. Stewart, at defendant's suggestion, had two martinis, a drink that she had not tasted before. About midnight, the group left and returned to Fremont Park. There they retired. Angie and her infant brother were placed in the back of the Stewarts' car and the older brother on the front seat. The parents bedded down on the ground near the car. Defendant retired to a spot near his car, which was parked nearby. Before separating the Stewarts had told defendant that they had been offered a peach picking job starting early that morning, and that they had accepted.

The older boy (nine years of age) testified that during the night Ashley came over to the Stewart car and knocked on the window; that he (the boy) had called out to his mother; that his mother, who was half asleep told him to go back to sleep; that he was frightened, and left the car and got under the blankets with his parents. When the Stewarts arose the next morning defendant and his car were gone.

Defendant was driving a 1953 two-toned green Chevrolet with New York license plates. The car had a defective transmission that leaked oil so that there was a deposit of oil wherever the car was parked with a thin distinctive trail of oil leading up to and away from the parking spot.

The Stewarts, when they awoke on the morning of August 8, 1960, assumed that Angie and her brother were asleep in the back of the car covered with blankets. They started out to their promised job of peach picking near the town of Stevenson. As they entered that town, Mrs. Stewart reached into the back seat to awaken the two children and discovered that Angie was missing. She immediately screamed "He took her," meaning the defendant. The authorities were notified and a search for the girl started. It centered around the Fremont Park area and around and about Mt. Bullion in Mariposa County.

Defendant was a natural suspect. On August 8, 1960, about 10 a. m. he was seen in a drug store and service station in Mariposa. At 11 a.m. he was seen and recognized in a café in the town of Mt. Bullion. The sheriff's office was notified. At about noon of that day he was arrested near a bridge on Norwegian Creek on Highway 49 not far from the town of Mt. Bullion.

Appellant vigorously denied knowing anything about the disappearance of Angie. Examination of defendant disclosed that his undershorts in an area of about 10 inches were wet, as if recently washed. Defendant claimed that he became scared when the officers pointed their guns at him, and urinated. His trousers, however, were not wet. The officers examined the area near Norwegian Creek and, under a bridge, found defendant's wet T-shirt and some wet paper towels. Defendant claimed he had gone to the area to sponge himself.

A pathologist examined the defendant shortly after 3 p.m. on August 8th. He found spermatozoa present in defendant's urinary orifice indicating an emission of semen within the previous 36 hours. He also discovered a fresh small laceration on defendant's penis. He had two bruises on his shoulder and two scratches on his left arm. There was a 3-inch charcoal smear on the back of the same arm. The significance of this smear will be mentioned later. The undershorts were examined and some small urine and seminal stains discovered, but no large urine stain.

The next day defendant was questioned by a special agent of the State Department of Justice by the name of Lazier. Defendant was then under arrest. He freely and voluntarily, without any promises or threats, answered a great many questions about his relationship with the Stewarts, but emphatically denied having anything to do with Angie's disappearance. He told the officer that he had been a member of the armed services for many years; that he was presently a warrant officer of the United States Army, and had come from New York on leave with orders to ship out to Korea from San Francisco; that he had driven out by car and ultimately arrived at Fremont Park in Merced County. He described his meeting with the Stewarts, the swimming episode, the carrying of Angie from the water and wrapping a blanket about her and him, and the trip to the doctor. He professed a great love for children, and stated that when first arrested he had had great sympathy for the Stewart family, but, because of his forced detention in jail, he was fast losing his sympathy for that family.

The next day, August 10th, defendant consented to show the officers the route he claimed that he had taken from Fremont Park to the point of his arrest. Lazier and Attorney Kane, one of defendant's then attorneys, were included in the party.

Defendant, as he later admitted, deliberately misled the officials on this trip. He described his activities at Fremont Park after the Stewarts had retired. He said he was unable to sleep and walked around the park. He pointed out where his car had been parked and oil deposits and trails were observed. They indicated his initial trip into the park, his departure for Gustine, his return, and his departure. Defendant stated he had driven from the park to Merced where he had stopped for oil, but he could not locate the station. He stated he had then driven towards Mariposa, stopping off the main highway to sleep for a couple of hours. This he later admitted to be false. He was not able, of course, to locate this spot. He then said he had driven to Mariposa to the service station where he had been seen. Oil deposits similar to those in the park were here discovered. He denied ever driving off of Highway 140 to his left. He stated he had continued on Highway 140 to its intersection with Highway 49, then on Highway 49 to Mt. Bullion where he had breakfast. Then he went on to Norwegian Creek where he stopped to look for rocks, in which he was interested, and where he was arrested.

On August 11, 1960, defendant was released from custody, apparently because of the insufficiency of the evidence against him.

The body of Angie was found on August 15, 1960, near a trail leading from the Agua Fria Road in an isolated area of Mariposa County. That road is a connecting road between Highways 140 and 49, the southerly end of this road running into Highway 140 some five and a half miles from Mariposa. The body was found two and a half miles from where defendant was arrested. It was found in a clump of live oak that had been burned leaving the trees with charred limbs. Thus the charcoal smear on defendant's left arm took on significance. The body was nude, with the sleeping garments of the child near her feet. A large quartz rock about twelve inches long and five inches across was found near the child's head. The body was badly decomposed, but identifiable. An autopsy revealed a skull fracture which could have caused death. It could not be determined from the examination because of the state of the body whether there had been any sexual abuse.

Just off the Agua Fria Road, by some cabins in the general area where the body was discovered, a car had been parked leaving oil deposits similar to those left by defendant's car.

Oil trails were also found at the intersection of Highway 140 and Agua Fria Road. An expert testified that the oil in defendant's transmission and the oil in the deposits were as "nearly identical as you get from two samples of the same material."

Several quartz rocks of the type found in the Agua Fria area were found in defendant's car. No such rocks were to be found near Norwegian Creek, where defendant claimed that he had picked them up. Eyewitnesses were found who were nearly run down by defendant as he entered Highway 140 from the Agua Fria Road. These witnesses positively identified him.

After the body of the child was discovered on August 15th, defendant again became suspect. After his release from jail, he had stayed a couple of days in Merced, and then drove to San Francisco. There he read in a newspaper that he was wanted, immediately surrendered to the San Francisco police, and was taken back to Merced.

The next day defendant was interviewed by Lazier and another officer and was told that the body had been found in the Agua Fria area and that the officers could prove that defendant's car had been driven into that area. Defendant said that if they could prove that "then I will think of some reason why I didn't drive it there."

Defendant continued to deny any connection with the killing, and after talking to his attorney Kane, refused to further discuss the case.

On September 13, 1960, defendant appeared in court for arraignment. He was then represented by the Public Defender of the County of Merced, Ben Curry. The trial judge stated that he had had Doctors Nash and Zeifert examine defendant and that they had informally told him that in their opinions defendant was mentally ill. Judge Maushart then declared because of that fact, and because of defendant's actions in court, he had a "doubt" of the present sanity of defendant, and that under section 1368 of the Penal Code[1] he was required to suspend all proceedings against

---

[1] That section requires that "If at any time during the pendency of an action and prior to judgment a doubt arises as to the sanity of the defendant, the court must order the question as to his sanity to be determined by a trial by the court without a jury, or with a jury, if a trial by jury is demanded; and, from the time of such order, all proceedings in the criminal prosecution shall be suspended until the question of the sanity of the defendant has been determined. . . ." The test under this section is whether defendant "is able to understand the nature and

defendant other than a hearing on his then sanity. The court carefully and properly informed defendant of his right to a jury trial on the issue, but defendant personally, and by his then counsel, waived such a trial. Doctors Zeifert and Nash were ordered to examine defendant and to report on defendant's sanity as that term is used in section 1368 of the Penal Code. By further stipulation it was agreed that the two doctors could file written reports and that only Dr. Zeifert need be called to testify at the court hearing set for September 20, 1960.

A hearing was held on that date at which defendant was represented by Ben Curry, the public defender, and by Thomas Kane, a private attorney. The written reports of the two psychiatrists were introduced into evidence, and Dr. Zeifert testified. By these reports the two experts opined that defendant was presently mentally ill and unable to co-operate with his counsel or to prepare his defense. Dr. Zeifert testified that defendant was definitely schizophrenic, and suffered from delusions of grandeur; that his condition was of long standing and slowly progressive; that the future is very dark for any improvement; that defendant believes that he does not need counsel because God is on his side; that he believes that he possesses the highest intelligence, and that others, including his lawyer, are of a lower mental order; that he confuses the identities of people, hears voices and has hallucinations; that he definitely is not malingering; that he told the doctor he had been much concerned about the children of the Stewart family and what the future held for them; that the boy could only look forward to being a ''beast of burden'' in the fields; that the girl could only look forward to a life of prostitution; that the girl would be better off dead; that if he were God he would either arrange for the girl's future or destroy her. He denied to the doctor, however, that he had harmed the child. The doctor stated that, in his opinion, defendant was dominated by his delusions; that he believes himself impervious to harm; that although he has denied the crime it is quite likely that before long he would tell about killing the child and why he did it (he did so that very afternoon). Defendant told the doctor all about his military background, how he had arrived in California, and all about how he met and associated with the Stewart

purpose of the proceedings taken against him and to conduct his own defense in a rational manner.'' (*People* v. *Merkouris,* 52 Cal.2d 672, 678 [344 P.2d 1], and cases cited.)

family, but he steadfastly denied killing the child. At the conclusion of the hearing the court concluded that defendant is "unable to properly assist his counsel in the preparation of his case," and found that at the present time defendant was mentally ill. It ordered defendant to be transferred to Atascadero State Hospital to be confined until his recovery, and then to be returned to face arraignment on the indictment.

On the afternoon of September 20, 1960, while defendant was still in jail in Merced, he was interviewed by Captain Moore of the Army Military Police in connection with some military problems caused by his arrest. Defendant, that very morning had been adjudged insane within the meaning of and pursuant to section 1368 of the Penal Code. Captain Moore generally discussed the Stewart case with defendant, and asked him what he thought could have motivated such a crime. Defendant thought for a moment and then stated "I killed her, sir." He then admitted that he had choked the girl and smashed her head with a rock, being motivated by "sex drives." He offered to take the officers to the murder scene.

Later, defendant repeated his confession to Undersheriff Williams, giving more detail. He admitted that he had not stopped on the Merced-Mariposa road to sleep, but had directly driven from Merced to the Agua Fria Road to the group of cabins located there; that Angie was asleep in the back of the car; that he slept for a while and when he awoke "he was overcome by a sex drive"; that he awoke the child and sexually abused her; that he then took a walk with the child and fed her; that he then decided he had to kill her; that he choked the girl and left her unconscious under a tree and went looking for a place to conceal her body; that he found such a place and threw the child's body into the clump of live oak where it was found; that he then went to the nearby creek, picked up a large rock, and threw it at the head of the child; that he then left the area in his car, and almost collided with a car as he reentered Highway 140.

Thereafter, defendant took the officers to the scene of the killing, and reenacted what had happened. At the scene he expressed the desire to die and asked the officers to kill him.

Defendant was then transferred to Atascadero. His medical file while there was introduced into evidence at his trial and is in the record. Included is a letter written in May 1961 to Dr. Newfeld, one of his attending physicians. Therein

he states that he murdered the girl; that he thought the matter over before committing the act and decided to kill her; that he does not think he was then insane, but "it is close"; and that he will accept the view that he was then "temporarily insane."

In January of 1961, while defendant was in Atascadero, the trial court relieved Kane and Curry of their representation of defendant.

On February 12, 1962, the superintendent of Atascadero filed the certificate required by section 1372 of the Penal Code,[2] attesting to the fact that in his opinion and in the opinion of his medical staff, defendant was now "able to understand the nature of the charges against him and can co-operate rationally with his attorney in his defense."

"In accordance with section 1372 of the Penal Code, I hereby certify that said defendant is now sane."

Later that same month, defendant, in propria persona, filed a writ of habeas corpus with the superior court claiming that he really had been sane for many months, and, therefore, had been denied a speedy trial, and also claiming that he had not been afforded counsel. On February 20, 1962, Judge Maushart attempted to appoint Ben Curry as his counsel, but defendant refused such or any appointment, and insisted on representing himself.[3] The court carefully pointed out to defendant his need of counsel, but such offer was steadfastly refused. The court then denied the writ of habeas corpus. At the same hearing, the judge stated that he remembered the reports of the psychiatrists rendered in 1960 to the effect that defendant was then hopelessly insane with very slight hope of recovery; that he, the judge, was

---

[2] That section provides: "If the defendant is received into the state hospital he must be detained there until he becomes sane. When he becomes sane, the superintendent must certify that fact to the sheriff and district attorney of the county. The sheriff must thereupon, without delay, bring the defendant from the state hospital, and place him in proper custody until he is brought to trial or judgment, as the case may be, or is legally discharged."

[3] From this date on, including the trial, defendant insisted on representing himself in spite of the trial court's urging that he accept appointed counsel. After defendant was convicted he was offered counsel on appeal, but insisted on representing himself. Defendant filed an opening brief that was more or less incoherent. This court, of its own motion, appointed Ben Curry as counsel on appeal and Curry has filed a brief, and also filed a motion to take additional evidence on appeal, which motion was denied. Defendant has consistently and vehemently objected to the appointment of Curry as counsel, and, in fact, to the appointment of any counsel, insisting on the right to represent himself.

"not satisfied" with the certificate of the Superintendent of Atascadero State Hospital; that "I have a strong doubt in my mind concerning your present sanity" and for that reason he was going to suspend all proceedings in the case until defendant could be reexamined to determine if there was a doubt of his present sanity. For that purpose he appointed Doctors Rapaport, Nash and Zeifert to examine defendant and report to the court, stating that if those reports gave any indication of present insanity he would order a hearing on that issue.

Upon announcing those conclusions, Ashley moved to disqualify Judge Maushart, on the ground that the judge had committed him to Atascadero without a jury trial, had shown antagonism to defendant, had delayed the habeas corpus proceeding, and was biased and prejudiced. The court denied the motion.

The three doctors subsequently filed reports all opining that defendant was presently sane within the meaning of section 1368 of the Penal Code. The court, based on these reports, declared that it had no longer any doubt about defendant's present sanity.

Defendant was arraigned on March 6, 1962. Curry was appointed counsel for the purposes of the arraignment, but upon defendant's objections Curry was relieved and defendant, at his own insistence, represented himself. He pleaded not guilty and not guilty by reason of insanity to both counts of the indictment. The court set April 17, 1962, as the date of trial.

On April 2, 1962, a hearing was had to discuss whether defendant desired subpoenas for any witnesses. The court again offered to appoint counsel, and again this offer was refused, defendant insisting that he wanted to represent himself. Defendant wanted to subpoena a group of patients from Atascadero for the purpose of proving that he had been in fact sane since at least September of 1961, and therefore had not been given a speedy trial. When the court explained that the testimony of those witnesses would not be material to any legal issue before the court because the court was bound by the affidavit signed by the superintendent of Atascadero, and that affidavit was dated February 9, 1962, defendant dropped his request for subpoenas for those witnesses. Then, in view of the pleas of not guilty by reason of insanity, the court appointed Doctors Rapaport and Zei-

fert under section 1027 of the Penal Code.[4] The court then reiterated its willingness to appoint counsel and its hope that defendant would accept such representation, but again defendant insisted on representing himself on the ground that ''I feel far more competent than I feel that Mr. Curry is competent.'' Then defendant again orally moved to disqualify Judge Maushart on the ground that the judge had not done all the things requested by defendant. The judge denied any such failure, and promptly offered to grant defendant a continuance if he desired one. Defendant refused such offer, and the judge then denied the motion for disqualification.

The case proceeded to trial on April 17, 1962. Ashley again moved to dismiss the prosecution on the ground that he had been denied a speedy trial, and again the motion was denied. The court again offered to appoint counsel but again the offer was refused.

The prosecution case proceeded with scarcely an objection by defendant, and he cross-examined but very few witnesses. The evidence was substantially similar to the evidence already summarized, and supports the jury's determination that defendant committed both of the acts charged. There is no claim to the contrary.

At the conclusion of the prosecution's case, defendant made an incoherent opening statement, in which he stated that he intended to prove that ''I am the best professional soldier on the earth; as the best professional soldier on the earth, it is impossible for me to become insane. As a professional soldier it is impossible for me to be wrong.'' When he went far afield from what is proper in an opening statement, and was warned by the court, defendant stated ''what I would like to be able to do, just speak what I want in this courtroom for as long as I want to under any conditions that I want to.'' In the course of his so-called statement he declared ''I took the child after having no intent. I killed the child and there was no malice and no malice in the business.'' He then expressed the desire to take the stand. The court carefully and properly told him of his right not to

---

[4]That section requires that where the defendant pleads not guilty by reason of insanity the court must appoint at least two alienists, one of whom must be from the medical staff of a state hospital. The duty is imposed on such appointees to examine the defendant, investigate his sanity, and to testify, when summoned, at any proceeding in which the sanity of the defendant is in question. The section also provides that any such appointed alienist may be called by either party, or by the court.

testify, but defendant insisted in doing so. His testimony covers some 62 pages of the reporter's transcript. It was rambling and sometimes incoherent. He told of his arrival at Fremont Park, of going in swimming with the children, of meeting the children's parents, of sharing his food with the Stewart family, of taking Angie to the doctor in Gustine, of retiring and being unable to sleep. He stated that he walked around the park and suddenly "I have a thought. . . . The thought is taking the child and destroying her." He stated that acting under this urge he silently removed the girl from the Stewart car and placed her in his and drove away. He told of stopping at the filling station in Merced and getting oil, and of his then driving to the Agua Fria Road, of his awakening of the child, disrobing her, and of sexually abusing her. Then, he testified, he began to wonder what he should do. He had kidnaped and molested a six-year-old child. If he did nothing, he knew that he would be identified and apprehended as the offender, and thus bring dishonor upon the army. If he took the child back to the parents he knew that they would call the police and then he would be arrested, and again he would dishonor the army. Another alternative would be to kill himself and kill the child. He thought that if he should kill the child and hide her body it would not soon be found; that this would hurt the parents and they would grieve at the loss of their daughter, but they would benefit from the publicity and probably get a job as a result of it. Thus the family would ultimately be benefited, that if he were arrested his own two children would be disgraced and a woman with whom he had consorted would lose her faith in him; that under these circumstances it was better that the child should die, provided that he was not caught; that if he killed the child she, being innocent, would go to heaven; that "[s]he can't lose"; that if he should kill her, if there be a God, he would be damned for eternity; that, on the other hand, perhaps God would figure that it was His fault and forgive him; that the "honorable thing to do under these conditions is to kill the child"; that he then entertained the girl and fed her, which took about an hour; that he then "took the child by the neck, placing my hands around it and squeezed. The body contorted and writhed. . . . I know it hurt the child for the child's body contorted and writhed, even though there was no sound"; that he thought he should hide the body, so it would not be found; that he looked for a place to hide the

body and saw the spot where it was ultimately found; that he then took the body there and hid it; that in doing so he got some charcoal on his shoulder; that he then lost control of himself; that he picked up a big rock and dropped it on the child's head; that he then drove away; that he figured his best defense was to keep "behaving normally and reasonably"; that he was still pretty tense and, as a result, when he turned out on the main highway, he forgot to stop and almost hit a car, the driver and passengers of which identified him; that he then purchased gas, a book on rocks, and had breakfast, and tried to act normal; that he wanted the police to catch up with him, and so while in the restaurant, he did some things to attract attention to himself, that when the police did not come as he expected he drove near to the bridge on Norwegian Creek, and went to look for rocks; that the police came there and arrested him; that he played "cat and mouse" with the officers by telling them a "sweet" and "innocent" story; that after a couple of days in jail he deliberately began to act indignant at his detention, and was allowed to leave jail; that he stayed around Merced a few days trying to create a good impression, and then came to San Francisco; that here he read in a newspaper that the child's body had been discovered, and that he was wanted for questioning; that he then called the sheriff in Merced and asked him what he wanted defendant to do; that he was told to give himself up to the San Francisco authorities; that it amused him to cooperate with the authorities; that he had trouble finding the police station but finally met an officer and surrendered; that he was brought back to Merced. This recital of his evidence is at best a limited summary culled from many pages of incoherent and rambling testimony. Defendant was the only witness called by the defense and was not cross-examined by the prosecutor. The prosecution introduced no rebuttal testimony. Both sides then argued the case to the jury. The prosecution simply reviewed the overwhelming evidence of guilt. Defendant's argument consisted mainly of a vague and incoherent dissertation of his beliefs, of his motivations and ideas. He was frequently admonished to confine himself to a discussion of the evidence, but such admonitions were ineffective. Finally defendant conceded he was needling the judge to try and get him to commit error. Finally the court stopped the argument. The district attorney gave a closing argument, and the jury was instructed. The jury,

in 17 minutes, came in with its verdicts of guilty of both charged offenses, and finding the degree of the murder to be of the first degree.

Immediately after the verdicts were brought in defendant stated that he desired to withdraw the plea of not guilty by reason of insanity, stating ''I am completely sane.'' The court denied the motion and ordered the insanity issue to be tried the next day.

The next morning, before the start of the sanity trial, the trial judge told defendant in chambers that the reason he had denied defendant's request of the evening before to withdraw the insanity plea was that he wanted to give defendant time to reflect on the matter, and that he wanted to talk to Dr. Rapaport to be sure that defendant knew what he was doing. He also stated that Dr. Rapaport had told him that defendant knew the nature and extent of the proposed withdrawal of the plea. The judge stated that in his opinion the plea should not be withdrawn, but if defendant so desired he could now withdraw the plea. Defendant stated that he did not now desire to withdraw the plea of not guilty by reason of insanity because although he thought it was right when he killed the child, he now knows it was wrong.

On the sanity trial, Dr. Rapaport, one of the appointed psychiatrists, was called as the court's own witness. He testified that he had examined defendant on three occasions, on February 25, 1962, April 10, 1962, and that very morning, April 26, 1962. At these various examinations, defendant was pleasant and cooperative, but refused to discuss what had occurred between the last hours of August 7, 1960, and noon of August 8th. The doctor also testified that, during the crucial periods, and for several weeks thereafter, defendant knew what he was doing, knew it was wrong and punishable to do what he did, knew the difference between right and wrong, and appreciated the nature and consequences of his act. He stated that he found defendant to be oriented as to time, place and person; that he expressed no delusions or hallucinations; that he did not hear or see, feel or smell things that were not there; that his intelligence was above average; that he had no memory defects.

Defendant, in his cross-examination of the doctor, asked several questions about insanity in relation to people with a superiority complex, the following question being typical: ''Doctor, suppose that a man knows an action is a viola-

tion of the laws of men and is satisfied that it is a violation of the laws of God, as he understands them, if there is a God, and he still thinks the action is right, would you say that he is insane?'' The doctor replied that that alone would not show insanity.

The court then asked ''would you state definitely, Doctor, in your opinion, was the defendant sufficiently capable of understanding the nature and the consequences of his act when the act was committed . . .?'' The doctor opined that defendant had sufficient capacity.

The prosecution then called the gas station attendant who had observed and talked with defendant on the morning of August 8, 1960, the doctor who examined defendant in the afternoon of that day after his arrest, a newspaper reporter who met and talked with defendant after his arrest on August 8, 1960, and again on August 10th. All stated that defendant then appeared normal, pleasant, cooperative and natural, and seemed to know what he was doing.

Defendant was the only witness for the defense. He expressly stated that he wanted to call no witnesses. His testimony was quite rambling, the gist of it being that all his life he had tried to help others without letting them know of his actions; that when he kidnaped the child he simply did not think about whether it was right or wrong; that when he killed the child ''I knew it violated the law of California and the law of the United States. . . . I thought it would be better, it would be right to violate the law of California, to violate the law of the United States. I might get away with it. I might not, but I thought it was right.

''. . . And I did it on the idea that if there was God, that I couldn't possibly get away with it unless God said, 'You are superior to the law of God.' I don't know. I did it believing that it was right. If it be insanity to believe it's right to kill a six-year-old child under those conditions, then I was insane. I don't know. I do know without any doubt I did it because I thought it was right. . . .

''. . . I am satisfied that I was wrong, that I did it thinking I was right. . . .''

On cross-examination he admitted that, after he had killed the child, he concealed the body so it would not be discovered; that when he was first arrested he deliberately misled the authorities; that when he killed the child he knew what he was doing; that he hoped that ''I wasn't really killing her, she was going to heaven, and she did''; that he knew what he

was doing violated the laws of California and the United States, and the Ten Commandments.

The case was then argued to the jury. Defendant's argument consisted of a rambling, incoherent discourse about his personal beliefs, his attitude toward God, his belief in the hereafter. He did state that "whether you know it, believe it, or anything else, I had no intent to kidnap the child, and I had no malice in sending the child to heaven"; that he knew that the jury was wrong in convicting him because "I know I had no intent and no malice"; that because of his attitude toward God "I can do no wrong"; that he takes "all blame," and "absolve[s] God of all responsibility" and "beseech[es]" Him "for forgiveness."

After instructions from the court, the jury in 36 minutes found defendant to have been sane at the time the two offenses were committed. The court then asked defendant if he had any witnesses under subpoena for the penalty trial and the defendant said that he had not.

On the penalty portion of the trial, the prosecution called a parole agent of the Department of Corrections, who testified that a person sentenced to life, by rule of the Adult Authority, comes before that body at the end of seven years of confinement to determine whether he should be paroled, and if so, when. A doctor in a mental hospital who had examined defendant four or five times at the request of the district attorney's office, testified that defendant freely talked to him about everything except the commission of the offenses; that the probabilities were that defendant might repeat the crimes if given the opportunity. Defendant did not cross-examine any of these witnesses, nor did he produce any witnesses on his own behalf, nor did he take the stand and testify. He did make a short, incomprehensible argument to the jury. The jury fixed the penalty for the first degree murder as death.

At the proceedings on sentence the court again offered defendant the services of the public defender as attorney, but again defendant refused.

There can be no doubt, and neither defendant nor counsel appointed in his behalf seriously contends to the contrary, that the evidence is sufficient to support the result reached by the jury on all three phases of the trial. Certainly the evidence overwhelmingly supports the finding that the murder was of the first degree. Not only does defendant's own story show a killing in the perpetration of acts punishable under section 288 of the Penal Code, and therefore a killing that was

of the first degree within the meaning of section 189 of the Penal Code, establishing the so-called felony murder rule, but defendant's own story establishes that the murder was deliberate, premeditated, intentional and with malice. After molesting the child he deliberately weighed the various alternatives, and determined that from his standpoint he should kill the child in order to avoid detection.

Certainly the evidence supports the finding that defendant kidnaped the child. The point need not be labored that the jury's finding of sanity on August 8, 1960, is supported. Dr. Rapaport, the only doctor called as a witness, so testified. Others who saw him shortly before and after his arrest testified that he then appeared and acted normal. The fact defendant testified he thought his acts were justified, merely, at most, created a conflict in the evidence, and did not prove insanity (*People* v. *Rittger,* 54 Cal.2d 720, 734 [7 Cal.Rptr. 901, 355 P.2d 645]).

On this automatic appeal the defendant again refused the services of an attorney, and filed an opening brief in propria persona, which has been considered. This court determined it would be in the interests of justice to appoint an attorney to file a brief and argue the case on behalf of defendant, and Ben Curry was appointed for this purpose. Curry has filed a brief, and has argued the case. Defendant waived the filing of a closing brief,[5] but has objected to the appointment of Curry and of any other counsel. It was proper to appoint such counsel, whether defendant desired him or not, as long as defendant's constitutional right to appear in propria persona was not violated (*People* v. *Darling,* 58 Cal.2d 15, 17 [22 Cal.Rptr. 484, 372 P.2d 316]).

The brief filed by defendant in propria persona is rambling, incoherent, and difficult to follow. He continues to urge that he was denied a speedy trial because he, in fact, became sane as early as April of 1961 but was kept in Atascadero until April of 1962. He correctly points out that the trial court refused to take evidence on that issue. He urges that if section 1372 of the Penal Code (see fn. 2) should be

---

[5]Curry also filed a request to take additional evidence on the appeal in an attempt to show that although defendant may have been sane when the trial started he broke down mentally during the trial. Inasmuch as there was a direct conflict in the affidavits on this issue, and because the record did not independently support the contention, and because if there is a doubt of defendant's present sanity it is the duty of the warden to take steps to ascertain that fact (Pen. Code, § 3701), the motion was denied.

interpreted so as to justify such procedure it is unconstitutional.

These arguments lack merit. The defendant was properly sent to Atascadero under section 1368 of the Penal Code in September of 1960. Under section 1372 he must "be detained there until he becomes sane." When that event occurs the superintendent "must certify that fact to the sheriff and district attorney of the county." The defendant is then to be tried. This procedure was strictly followed. If defendant had, in fact, regained his sanity by April of 1961, and then wanted to go to trial, his proper remedy was against the superintendent. Defendant took no steps to challenge the legal right of the Atascadero officials to detain him in their custody. Defendant did not come within the jurisdiction of the superior court until the affidavit was filed, and he was arraigned and tried within a few days after such filing.

Such procedure is not unconstitutional. These sections evidence a proper state policy to prohibit the trial of an accused person unless he understands the nature of the proceedings against him and can assist in preparing a rational defense. If he cannot he shall be hospitalized (*In re Cathey*, 55 Cal.2d 679, 690 [12 Cal.Rptr. 762, 361 P.2d 426]). Once hospitalized the determination of when sanity is restored is placed on the superintendent (*In re Phyle*, 30 Cal.2d 838 [186 P.2d 134]). If the superintendent refuses to perform his duty doubtlessly he can be compelled to do so. But as was said in *People* v. *Superior Court*, 4 Cal.2d 136, 145 [47 P.2d 724], once a person has been committed under section 1368 of the Penal Code "no court in this state is authorized to discharge him therefrom, or to restore him to the capacity of a sane person, under any circumstances, except upon writ of *habeas corpus*. The power to discharge him otherwise than upon *habeas corpus* is vested exclusively in the officers of the asylum." Here, when the writ of habeas corpus was filed and heard, the officials at Atascadero had already certified him as sane, so there was no room for the operation of the writ. Such procedure clearly protected all of defendant's constitutional rights.

Both appointed counsel and appellant contend that defendant properly moved to disqualify the judge. Defendant on February 20, 1962, orally moved to disqualify the judge on the ground of prejudice, apparently under 170.6 of the Code of Civil Procedure providing for a peremptory challenge. This was during the proceedings involving the peti-

tion for habeas corpus and to determine whether the court should appoint counsel. The defendant stated that he challenged the judge on the ground he was biased and prejudiced, stating several reasons in support thereof. None of the stated reasons was sufficient to show bias and prejudice. Section 170.6 of the Code of Civil Procedure provides that no judge shall preside or hear any matter in a criminal or civil proceeding when "it shall be established as hereinafter provided that such judge is prejudiced." Then the section provides that prejudice can be established "by an oral or written motion without notice supported by affidavit or an oral statement under oath" charging prejudice. The section requires the motion to be made, normally, five days before the day set for trial, or the time the case is assigned for trial, and, if properly made, the question of prejudice shall be passed on by another judge.

In the instant case the motion was first made on February 20, 1962, after the court had denied the petition for habeas corpus, and had stated that it wanted to investigate the sanity of defendant. The defendant again renewed this motion at his arraignment on April 2, 1962. The oral statement challenging the qualifications was neither supported by affidavit nor was it a statement under oath as required by the code section, and failed, as a matter of law, to state any ground for disqualification. The defendant first came before Judge Maushart twice in September of 1960, when he was represented by counsel, and no motion was then made to disqualify the judge. Under such circumstances the motions made were properly denied.

Defendant in propria persona next urges that because the indictment is in the name of the "People of California" and the jurors were of course "people" of this state, the same "people" served as judge and jury, and for that reason the judgment should be reversed. To state the contention is to refute it.

The next question presented involves the failure of the trial court to appoint counsel for defendant. The trial court not only informed defendant of his right to counsel, but time and time again urged defendant to accept counsel, but defendant insisted on his constitutional right to defend himself (art. I, §13).[6] Defendant stated he would accept counsel to ad-

---

[6]Art. I, § 13, of the Constitution provides in part "In criminal prosecutions, in any court whatever, the party accused shall have the right . . . to appear and defend, in person and with counsel."

vise him, and wanted counsel in that capacity, but that he wanted to have charge of his defense. Of course, while a court may, in its discretion, appoint counsel for this purpose, it is not required to do so. ▮ A defendant has no absolute right to the services of an attorney in a purely advisory capacity. (*People* v. *Mattson,* 51 Cal.2d 777, 797 [336 P.2d 937]; *People* v. *Linden,* 52 Cal.2d 1, 18 [338 P.2d 397].)

▮ Counsel suggests that because of defendant's mental condition he may have been mentally in a condition to assist counsel in his defense, but was in no mental condition to defend himself. Certain parts of the record are referred to in an effort to support this conclusion. They do not do so. These were matters for the trial court to weigh. If at any time before or during the trial the judge entertained a doubt of defendant's sanity it was his duty to stop proceedings and try the issue of present sanity. (Pen. Code, §1368.) He was in the best position to weigh such matters (*People* v. *Merkouris, supra,* 52 Cal.2d 672, 679). Here, before the trial court allowed defendant to represent himself, the trial court sought the advice of three psychiatrists, was assured by them that defendant was presently sane within the meaning of the section, and had several discussions with defendant about the problem. The record sustains the conclusion that defendant was aware of his situation when he insisted on representing himself. These factors are controlling. (*People* v. *Linden, supra,* 52 Cal. 1, 18.)

The rest of defendant's contentions made in his brief filed in propria persona are so lacking in merit that they need not be discussed in detail. ▮ It is urged that the trial court committed error in limiting certain parts of defendant's opening statement. Defendant was attempting to refer to matters not admissible in evidence, and the court properly told him this he could not do. ▮ The defendant also claims that he has a constitutional right to argue his case before this court. There is no such right. His other contentions are so rambling and incoherent, and unsound, that they need not be mentioned.

▮ The next question presented is whether the trial court in February 1962 should have ordered a trial on the issue of defendant's then sanity. If it then entertained a ''doubt'' as to the sanity of defendant, section 1368 requires that ''the court must order the question as to his sanity to be determined'' by a trial. It will be remembered that in September of 1960 the court had expressed such a doubt, and

a proper trial was held, resulting in the determination of then insanity. In February of 1962 the superintendent of Atascadero had certified that defendant was then sane. In proceedings on February 20, 1962, which were primarily concerned with appointment of counsel and the habeas corpus proceeding, the court itself raised the question of present sanity. It stated that it had received the affidavit from Atascadero, and then stated that it had in mind the reports filed in the case by the psychiatrists in the sanity hearing in 1960 indicating that defendant was then hopelessly insane, and that his chances of recovery were very slight. The judge then stated ''I am not satisfied with the report issued by the Superintendent and Medical Examiner of the Atascadero State Hospital where he certifies that you are now sane. I have a strong doubt in my mind concerning your present sanity and for that reason I am going to suspend all proceedings in your case.'' He then stated that he was going to have defendant examined by the three named psychiatrists to advise him on this question, and ''when those reports are in, if there are any indications at all that you are not sane, a hearing on that matter will be held. If the reports indicate that you are sane and that you can assist counsel in the preparation of your defense, then the Court will set the matter for trial.''

Then on March 6, 1962, defendant came up for arraignment. The court then stated that after receiving the report from Atascadero ''This Court was not satisfied with that report . . . and expressed a doubt as to the present sanity of the defendant,'' and ordered defendant examined by three psychiatrists. The court continued that it had that day ''received a copy of the psychiatric examination which indicates that the defendant is at the present time capable of assisting counsel in the preparation of the defense of the matter with which he is charged. And accordingly, based on this report, the Court no longer has any doubt as to the defendant's capability in assisting counsel in the preparation of his case.''

Counsel insists that because on February 20, 1962, the judge expressed a ''doubt'' as to defendant's sanity he had no legal right to change his mind on March 6, 1962. It is urged that defendant was then entitled to a trial on the issue of present insanity. Some general language used in *People* v. *Merkouris,* 46 Cal.2d 540 [297 P.2d 999], and in *People* v. *Aparicio,* 38 Cal.2d 565 [241 P.2d 221], is relied upon.

It must be conceded that if the court had the ''doubt'' mentioned in section 1368, it was required to hold the trial men-

tioned in that section. But the record indicates that the doubt mentioned in that section was not here expressed, as a matter of law. A reading of the record demonstrates that on February 20, 1962, the judge had in mind the testimony of the competent psychiatrists who in September 1960 had found defendant's insanity was probably incurable, and now about 18 months later he had an affidavit from Atascadero that defendant was presently sane. The judge could have relied on the affidavit from Atascadero, but this he was not satisfied to do. Although he expressed the thought somewhat awkwardly, it is obvious that he was troubled by the possible conflict in the evidence on the issue of present sanity. Out of an abundance of caution, and in order to protect the rights of defendant, he decided to give two of the very doctors who had examined defendant in 1960 a chance to examine him again and to determine whether or not their opinion given in 1960 that he would probably not recover had been correct. He appointed those two psychiatrists and another one to examine defendant and to report to him. When they had done so, and all expressed the opinion that defendant was presently sane, any question he had in his mind was answered. Certainly a judge, particularly in a case where the death penalty may be imposed, has the legal right to seek expert assistance to inform him as to mental condition of the defendant before he is required to express whether he has the "doubt" as to that condition as that term is used in section 1368. That is what was done here. Such preliminary investigation by the judge does not fall within section 1368 of the Penal Code (*People* v. *Pico,* 62 Cal. 50, 55; *People* v. *Stock,* 19 Cal.App. 748, 749 [127 P. 798]).

It is next urged that the court committed error in not calling Dr. Zeifert to the stand to testify on the sanity portion of the trial. The contention seems to be that, once appointed under section 1027 of the Penal Code, a doctor must not only examine defendant to investigate the question of his sanity at the time the offenses involved were committed, but that it is mandatory that the court call him to testify if neither the prosecution nor defense does so.

Doctors Rapaport and Zeifert were appointed under section 1027 of the Penal Code on April 2, 1962. They examined defendant as required by the section, and each rendered a written report as to his findings. Copies of such reports were furnished defendant.

At the sanity trial the court only called one of the two doctors, Dr. Rapaport, as its witness. The court examined, and the district attorney and the defendant cross-examined him. Dr. Zeifert was not called by the court or the parties. Defendant had had a subpoena issued for Dr. Zeifert which required him to testify on a certain date that turned out to be later than the day of the sanity trial. After defendant had testified on his own behalf on the sanity trial, the court asked him "Mr. Ashley, do you have any further witnesses," and when defendant answered "No, sir," the court repeated "You don't desire to call any witnesses in this case," and defendant stated "No sir. I can only say what I know." Defendant then stated that he rested his case. Dr. Zeifert did not respond to the subpoena because the sanity portion of the trial had been completed before the date fixed in the subpoena.

Section 1027 of the Penal Code requires that when a defendant has pleaded not guilty by reason of insanity the court must appoint at least two alienists "to examine the defendant and investigate his sanity." The duty to examine and investigate such sanity is then imposed on such doctors as well as the duty "to testify, whenever summoned" on the issue of sanity. Then the section provides:

"Any alienist so appointed by the court may be called by either party to the action or by the court itself. . . ."

In reference to being called to testify, the language of the section is permissive and not mandatory. The language is "*may* be called," not "*must* be." There was no mandatory duty on the court to call the witness. Moreover, the record shows that defendant did not want any further testimony on the subject and expressly stated that he did not have any witnesses that he desired to call. He had received a copy of the report of Dr. Zeifert, had presumably read it, and evidently did not think there was anything in it that would be helpful to him. Certainly no prejudice has been shown by the failure to call Dr. Zeifert.

 The district attorney did not commit prejudicial error in his argument on the penalty portion of the trial when, in arguing for the death penalty rather than life imprisonment, he stated "What are the prospects of the future? First of all here is a man that there is no reason to believe will not murder again. And here is a man who under the current state of the law will presumably not serve life imprisonment, and who if he is released is certainly no less cap-

able when he is released of doing what he did the first time. Probably more so.''

The objection to this argument seems to be that, while the testimony was to the effect that a life termer becomes eligible for consideration for parole after serving seven years, this statement presumed that he would be paroled. There was no testimony as to when, if ever, this defendant would be parroled, or what the average time served by life termers convicted of murder might be before parole. All that the argument stated was that defendant, as a life termer, would be eligible for parole, and, presumably, at some indefinite time in the future might be paroled. This falls within the proper scope of argument. (*People* v. *Jones,* 52 Cal.2d 636, 650 [343 P.2d 577] ; *People* v. *Chessman,* 52 Cal.2d 467, 495 [341 P.2d 679].)

Counsel for defendant objects to an instruction given on the penalty phase of the trial. The court instructed that the jury in exercising its discretion as to penalty could consider that the law provides that a person sentenced to death or life imprisonment may be pardoned or have his sentence reduced by the Governor and that a prisoner serving a life sentence may be eligible for parole. This portion of the instruction was admittedly proper. The instruction then continued ''A trial judge may also reduce the penalty from death to life imprisonment.'' The objection is that this impliedly told the jury the trial court had the power to reduce the penalty even on its own motion. The law is, of course, under section 1181, subdivision 7, of the Penal Code, that such power exists only on motion for a new trial and only if defendant moves for such new trial. (*People* v. *Moore,* 53 Cal.2d 451 [2 Cal.Rptr. 6, 348 P.2d 584].)

The instruction, while not technically complete, could not have possibly misled the jury. The jury was fully and properly instructed that it was its responsibility to select the penalty, that in doing so it should conscientiously consider all the evidence, in exercising its discretion, that it was not necessary to find mitigating or aggravating circumstances, and that ''the law commits the entire matter to your judgment and conscience based upon a sound and absolute discretion.'' Thus the jury knew its responsibility in fixing the penalty and could not possibly have been misled, by the technical incompleteness of the instruction. Defendant did not ask for a more specific instruction on the subject.

Objection is also made to the instruction to the effect that: "The evidence in this case is such that either the defendant is innocent of the charge of murder, or he is guilty of murder in the first degree."

It is contended that the effect of this instruction was to prevent the jury from determining the issue of defendant's mental ability to deliberate and premeditate. A very specific proper instruction was given to the jury to the effect that they should consider the mental state of defendant in determining whether he had the specific intents required of these crimes.

Moreover, the evidence of defendant himself shows that the killing was committed in perpetrating acts punishable under section 288 of the Penal Code, and also establishes that the killing was willful, deliberate and premeditated. Under such circumstances the challenged instruction was proper. (*People* v. *Alcalde*, 24 Cal.2d 177, 188 [148 P.2d 627].)

This is a fair analysis of the problems involved on this appeal. The evidence supports the verdicts. This court has no power to reweigh that evidence. The legal points raised are without merit. Under these circumstances, the judgments must be affirmed.

Counsel argues that defendant is presently insane, and therefore, should not be executed. In this connection strong reliance is placed on an affidavit of Dr. Schmidt, chief psychiatrist at San Quentin, that appears in the record. If it is a fact that defendant is presently insane, there is a complete statutory scheme by which that fact may be ascertained (Pen. Code, §§ 3700 to 3706). That statutory scheme was supplemented in 1961 by the addition of section 3700.5 to the Penal Code. That section requires all persons sentenced to death to be examined by three alienists and that they shall report their findings at least 20 days prior to the execution to the warden and to the Governor.

The judgments appealed from are affirmed.

Gibson, C. J., Traynor, J., Schauer, J., McComb, J., Tobriner, J., and Peek, J., concurred.

Appellant's petition for a rehearing was denied April 9, 1963.