[Crim. No. 11657.  Second Dist., Div. Five.  Aug. 23, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. M. HOLBERT BROWN, Defendant and Appellant.

Elinor Chandler for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Bradley A. Stoutt, Deputy Attorney General, for Plaintiff and Respondent.

STEPHENS, J.—Defendant Morgan Holbert Brown, in an information filed by the District Attorney of Santa Barbara County, was charged in count I with a violation of section 484 of the Penal Code (grand theft), and in counts II and III with violations of section 26104, subdivision (a) of the Corporations Code (selling or attempting to sell a security without a permit).

Pleas of ''not guilty'' and ''not guilty by reason of insanity'' were entered to each of the charges. Defendant Brown subsequently moved to withdraw his plea of ''not guilty by reason of insanity.'' The motion was granted after argument by counsel, and the plea was withdrawn.

On the date set for trial, Brown's counsel asked to withdraw, and the request was granted upon assent from the prosecuting attorney and from Brown himself. Brown explained that he had sufficient funds with which to retain counsel, but that he desired to represent himself, explaining that he had previous experience in representing himself in past trials.

The date of trial was set for May 13, 1965, two days after the above appearance. On the 13th, the jury was selected. Trial was then postponed until the 25th, at which time it commenced. Defendant originally attempted to have the trial commencement set for the 18th, but this was denied. As it developed, defendant received his extra time and then some.

After trial by jury, Brown was found guilty on count I and not guilty on count II. Count III had previously been dismissed. Brown's motion for a new trial was denied, and pursuant to Penal Code section 1203.03, he was referred to a diagnostic facility of the Department of Corrections for diagnosis and recommendations, which were to commit defendant to the Department of Corrections. Brown was returned to the court after observation, at which time the court denied probation and sentenced him to prison for the term prescribed by law.

Brown appeals from the denial of his motion to dismiss each count of the indictment, from the denial of his motion for a new trial, and from the judgment.

■ Under Penal Code section 1237, Brown may here appeal only from the final judgment of conviction, although upon appeal the appellate court may review the order denying a motion for new trial. The denial of the motion to dismiss is not reviewable on appeal.

The victim of the alleged grand theft, one John P. Dahl, president of Uncle John's Restaurant, first met Brown in May of 1963 at a party. There they engaged in light conversation about defendant's activities in the oil business. Brown invited Dahl and his wife to attend a polo match two weeks later as his guest. Brown hosted a luncheon beforehand at which several people were present. After lunch, all the guests went to the Browns' box at the polo field. Mr. and Mrs. Brown, Mr. and Mrs. Dahl, and Mr. Ted Weiner went to dinner together after the match. Dahl testified that during the course of this meal Brown discussed his current interest in the Hollister property near Gaviota and his intention to drill there under his present lease with Weiner, who was also in the oil business. Oil rigs were also discussed, and Brown indicated he had things "pretty well taken care of."

Brown did not then have the lease. Brown sought the lease during August 1963. This lease was finally obtained in a writing dated September 3 from the California-L Exploration Company, known as Cal.-L. Cal.-L had the major lease on all the property in which Brown was interested. Under this agreement Brown had 60 days in which to commence drilling. In November of 1963, DeWitt Langford, Cal-L's vice president, attempted to notify Brown of the expiration of the 60-day drilling agreement, and when Brown could not be located in Santa Barbara, notice was mailed to Brown in care of the Royal Globe Oil Corporation, but was returned unopened.

During late May 1963, Brown had contacted one Edward Bunting, an oil operator and contractor. They agreed that Bunting would drill the proposed well for a 40 percent interest and that Brown would supply $20,000 cash to pay for the initial drilling costs. Bunting never received any cash, and he made no attempt to begin drilling the well.

Either on the evening of the polo match or shortly thereafter, Brown invited Dahl to visit the property with him, and Dahl indicated he would at some convenient time. Around

July 23, 1963, Brown contacted Dahl, and on the 24th, the two men visited the proposed site of the well.

At the proposed site on the Hollister ranch, along the Pacific Coast, Brown pointed out the extent of the leased property, the location of the surrounding wells, both onshore and offshore. Brown produced a ''drilling log'' on a dry well which had previously been drilled on the site, and he explained to Dahl that there were showings of oil and that a competent oil man could have brought the well in. Dahl was ignorant as to the oil business and had never before seen a drilling log. In answer to a question from Dahl, Brown stated that his well would be placed at the spot where his geologist indicated would ·be the most favorable location. The two discussed the financing of the well; it was indicated that the cost would be over $100,000 and that in the business it was customary to sell interests to other prople. Brown was willing to sell Dahl a 10 percent interest in the well for $10,000.

The discussion also covered the projected income generation of the well. Brown suggested that based upon the high grades of oil which nearby wells were producing, the possibility existed that an income of five to six thousand dollars a day might be realized if they should find oil of a similar grade. Dahl concluded the conversation by saying that he would think over the offer.

About three days later, Brown and another gentleman went to see Dahl at the latter's office. Dahl was in the company of an associate from New York City, a Mr. Pistell. Brown discussed the oil plans with Dahl and Pistell. It was indicated by Brown that he was set to commence drilling and Dahl should make up his mind one way or another.

On the 28th of July, Brown stopped by Dahl's office for just a few moments. On the 30th, Brown had lunch with Pistell and Dahl, and said he had percentages set aside for both gentlemen but he was ready to begin and wanted them to make up their minds.

On August 2, Brown again called to inquire of Dahl's intentions. Dahl said he was leaving for New York for three weeks and invited Brown over to his office to discuss the matter. Brown went to Dahl's office. There Brown said he was about to begin the drilling arrangements and commence actual drilling, and he wanted to know if Dahl had made up his mind. Brown mentioned that Pistell had shown an interest in the venture. Dahl stated that whether Pistell joined the venture was up to him, and after a few more questions as to

when Brown would begin drilling, Dahl wrote a check for $10,000.

The check was made payable to the Royal Globe Oil Corporation, a Texas corporation of which Brown was the chairman of the board. Brown then prepared a receipt at the request of Dahl. This receipt indicated that the Royal Globe Oil Corporation received $10,000 from John P. Dahl for a 10 percent interest in the No. 1 Hollister. The receipt indicated that the corporation in Texas would send the necessary papers and assignments to Dahl forthwith.

Following this meeting, Dahl went on an extended trip for three weeks.

About September 1, 1963, Brown was flown by Herman Noland in a chartered plane to Las Vegas, Nevada and from there they flew to Reno. Pistell met Brown in Reno and with another person they then flew on to Winnemucca, Nevada, where they landed at an air strip adjacent to a gold mine being developed by Dahl and Pistell. Pistell showed Brown the mine, and inquiries were made by Brown as to the costs of the operation. Brown then returned to Reno. On September 8, Brown was flown to San Francisco, where he contacted Dahl and Pistell. Dahl was in town on the last part of his three-week business trip. Brown went to see Dahl and Pistell, and was accompanied by Noland. At the meeting, several other men were present. Brown stated that he did not like the mine and would not recommend that Weiner invest in the mine since Brown felt the operation was no good. According to Noland, this statement was not well received by Dahl and Pistell. The next day Brown again met with Dahl and Pistell. During this conversation, Dahl inquired about the papers from Royal Globe. Brown said he should have received them. Dahl said he did not have them. Pistell then said Dahl should forget the whole thing and Brown should return his money to him. Dahl testified that he did not then demand the return of his money. Noland, who was present also, stated that Dahl did ask for the money back. (It was Brown's defense that when Brown refused to recommend the mine as an investment, Pistell refused to put up his money for the well and Dahl wanted his money back. Their investments together would have equalled $20,000, which was the amount required by Bunting in order to begin his drilling on the proposed well.) Dahl never received any papers from Brown or Royal Globe Oil Corporation.

Upon his return from San Francisco, Dahl attempted to call

Brown, but the number had been disconnected as Brown had moved to Brentwood.

A bank account had been opened by Brown in the name of the Royal Globe Oil Corporation in November 1962. Only Brown had the authority to draw on it. The account was overdrawn in July of 1963, and by August, the balance was up to $2.22 at the time the $10,000 check was deposited. The balance declined to $902.48 on September 3 and $115.96 on the 8th. The account was closed on October 18, 1963 "due to overdraft."

At no time did Brown or his corporation post the necessary indemnity bonds or file the required notice with the State of California, Division of Oil and Gas. Also, similar permits required by the County of Santa Barbara were not obtained by Brown. It was stated that the time necessary to meet the state and county requirements was very short.

There was no evidence in any official post office records that the Browns left their forwarding address at the time of their move to Brentwood, although Mrs. Brown testified that she had. Brown and his wife had moved to Santa Barbara in September of 1962. In late August of 1963, they moved to Brentwood, California. After a year in Brentwood, Mrs. Brown moved to Los Angeles. In May of 1964, Brown separated from his wife and after a trip to New Orleans, settled at a Santa Monica Motel.

■ Defendant's first complaint is that the trial judge committed prejudicial error in failing to inform defendant of his right to challenge the jurors. Penal Code section 1066 provides: "Before a juror is called, the defendant must be informed by the court, or under its direction, that if he intends to challenge an individual juror he must do so when the juror appears and before he is sworn."

Defendant cites *People* v. *Moore* (1894) 103 Cal. 508 [37 P. 510] as standing for the proposition that a failure to comply with this section when defendant is not represented by counsel is *per se* reversible error. This is not the law. The *Moore* case was overruled in *People* v. *Russel* (1909) 156 Cal. 450, 457-459 [105 P. 416].

As stated in *People* v. *Mortier* (1881) 58 Cal. 262, 266: "The object of this provision of the law is to protect the rights of the defendant in the matter of challenging jurors." *Mortier* continues by saying that since it appeared from the record that defendant's rights were understood by defendant and his counsel, and the privilege of challenging jurors was

exercised to a large extent, there was no prejudice to the defendant.

The record in the case before us shows that the trial judge conducted an extensive examination of each prospective juror, one of whom was excused by defendant for cause, at the court's suggestion. Another was also excused by the court when it was revealed he might be biased. When the prospective jurors were in the box, defendant was directed to question each juror for cause. At several points defendant expressed his desire to excuse various prospective jurors. The court instructed him that the time to peremptorily excuse jurors would be reached later and that only excuses for causes were proper at this stage. When defendant and the district attorney concluded their examinations for cause, they were directed by the trial judge to excuse jurors peremptorily. During this period defendant excused four prospective jurors. After the jury box was filled the last time, defendant accepted the jury. One jury member then made a remark about employment, prompting the court to allow defendant further inquiry. Again the defendant accepted the jury. Defendant requested two alternate jurors be selected, and they also were questioned and accepted by both sides. Suffice it to say that no prejudice is shown from the court's conduct. Defendant participated in the questioning of the jury in a knowledgeable manner, and concluded by accepting the jury. While he was not directly told of his rights under Penal Code section 1066, it is clear from the record that these rights were familiar to him and exercised by him. No specific prejudice is claimed by defendant, and no prejudice appears in the record.

Defendant secondly contends that the evidence was insufficient to sustain a conviction in that the requisite specific intent was not proved.

No direct evidence was introduced to show defendant's intent. Evidence was introduced to show that on several occasions representations were made to Dahl that defendant was ready to drill immediately; that the lease to drill was obtained by defendant one month after the money was received; that no effort was made to act upon the July agreement with the drillers; that no drilling permits were obtained; that the money was spent by defendant for purposes other than drilling Hollister No. 1; and that no papers were ever forthcoming from Royal Globe Oil Corporation to represent Dahl's purchase of the 10 percent interest in the well despite Brown's assurances that the papers were prepared.

■ This court must assume the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict. (*People* v. *Newland* (1940) 15 Cal.2d 678 [104 P.2d 778].) ■ Specific intent is rarely shown by direct proof and thus circumstantial evidence may be used to provide this proof. (*People* v. *Moore,* 234 Cal.App.2d 29, 31 [44 Cal.Rptr. 184].)

The evidence shows that defendant did have experience in the oil business and that he had taken some of the required steps to complete his proposed venture in the No. 1 Hollister well. Our concern, however, is whether the jury could reasonably believe from the evidence that defendant took Dahl's money with the intent to permanently deprive him thereof.

■ The evidence is sufficient to sustain the jury's finding. While defendant represented to Dahl that he was ready to proceed immediately, necessary lease rights were not obtained for another month, and the remainder of the necessary financing was never obtained. Defendant said on two occasions that the assignments would be forthcoming from the Royal Globe Oil Corporation, although the corporation was apparently not instructed to prepare the papers, and Dahl never received them from defendant or the corporation. Defendant spent the money as his own for purposes other than promised to Dahl, having less than $1,000 remaining in early September when the lease rights were obtained. Certainly the fact that defendant might have fulfilled his promise, and produced a valuable well had he done so, has no bearing upon the intent of defendant to deprive Dahl of his money. The proof of intent may consist of reasonable inferences drawn from affirmatively established facts. (*People* v. *Morton* (1961) 191 Cal.App.2d 744, 753 [12 Cal.Rptr. 817] ; *People* v. *Collins* (1959) 172 Cal.App. 2d 295, 299 [342 P.2d 370].)

It is a reasonable conclusion that defendant had no intention to use Dahl's money to finance the well, but rather intended to use it for his personal needs and that the proposed oil venture was merely a means which defendant could use to obtain this money from Dahl.

■ Defendant's third and fourth claimed errors lie in the trial court's permitting defendant to represent himself during the course of the trial, and in the court's conduct of the trial. Defendant offers no argument and includes no references to any part of the transcript in support of his claim that he was incapable, or that the trial court conducted the

trial in a manner prejudicial to him. There is no need to repeat California's history of allowing defendants the right of counsel, nor the ability of a competent defendant to waive counsel. (See *People* v. *Terry* (1964) 224 Cal.App.2d 415, 417-418 [36 Cal.Rptr. 722].)

The trial court patiently explained to the defendant his right to be represented by counsel. Upon inquiry, the judge ascertained that defendant possessed funds with which to retain counsel if he so chose. The court then explained in detail the disadvantages of not having the assistance of counsel. Defendant adamantly chose to represent himself, proclaiming that his prior experience had all resulted in victories: "[Mr. Brown]: Your Honor, I have tried nine cases and haven't lost one. [The Court]: You say you haven't lost one? [Mr. Brown]: Not one. [The Court]: Well, nothing succeeds like success, I guess."

The major factor to be considered here is defendant's capability to waive counsel. At the preliminary hearing, defendant, represented by counsel, entered pleas of "not guilty" and "not guilty by reason of insanity." Subsequently, and after examination by two court-appointed psychiatrists, defendant, still represented by counsel, moved to withdraw the latter plea. This motion was granted. Defendant now claims his conduct during the trial shows that he was a "disturbed" individual, and seeks to demonstrate this with disjointed, isolated pieces of testimony which read very differently in their full context. Defendant cross-examined at length every witness put on the stand by the People. He continually sought, by their cross-examinations, to prove his defense. He offered several witnesses on his own behalf. Defendant demonstrated that he possessed a knowledge and understanding of the proceedings, and this is the necessary prerequisite. The trial judge was clearly in a position to judge defendant's mental state both at the time defendant chose to dismiss counsel and during the entire course of the trial. (*People* v. *Ashley* (1963) 59 Cal.2d 339, 361 [29 Cal. Rptr. 16, 379 P.2d 496] ; *People* v. *Linden* (1959) 52 Cal.2d 1, 18 [338 P.2d 397] ; *People* v. *Terry, supra,* 224 Cal.App.2d 415, 417.)

There is no showing of any specific prejudice to defendant. A reading of the transcript shows that the trial judge was both patient and of assistance to the defendant, continually making certain that none of defendant's rights was violated.

It is hard to see how the trial could have been conducted in a manner more fair to defendant.

Defendant's final complaint on this appeal is that the court gave to the jury instruction CALJIC 51 (Rev.), which the court modified to read as follows: "It is a constitutional right of a defendant in a criminal trial that he may not be compelled to testify. Thus, whether or not he does testify rests entirely in his own decision. You are not to draw any inference against the D[efendant] in this case because of the fact that he elected not to testify.

"In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence, and upon the failure, if any, of the People to prove every essential element of the charge against him, and no lack of testimony on defendant's part will supply a failure of proof by the People." Defendant relies upon *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229] to support his contention that the given instruction was prejudicial error. This reliance is misplaced. The judge carefully removed from CALJIC 51 (Rev.) any prejudicial wording. Furthermore, no reference was made in any of the oral arguments to the failure of defendant to take the stand. What was left was merely an accurate statement of the law, cautionary in nature, and which would serve to still the jury's unwarranted and unlimited roaming at large in drawing such inferences as it will from the failure to testify.

The thrust of the *Griffin* decision was to prevent such silence from becoming part of the proof in the prosecution's case. This is what the given instruction sought to prevent.

The appeal from denial of motion for a new trial is dismissed, and the judgment appealed from is affirmed.

Kaus, P. J., and Hufstedler, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 19, 1967.