# STATE OF HAWAII *v.* JAMES KEAWEHALU WONG.

## No. 4343.

February 17, 1964.

TSUKIYAMA, C.J., CASSIDY, WIRTZ,
LEWIS AND MIZUHA, JJ.

362

OPINION OF THE COURT BY LEWIS, J.

Defendant, who was in prison serving sentences for robbery and other offenses, escaped and while at large, on or about July 7, 1956, committed murder in the first degree, *i.e.*, "with extreme atrocity and cruelty,"[1] according to the indictment before us.

This is the second indictment for the same offense. The present indictment, designated Criminal No. 33108 in the Circuit Court, was returned May 17, 1962 after defendant

---

[1] R.L.H. 1955, § 291-3.

was discharged from the rolls of the State Hospital, formerly known as the Territorial Hospital, on February 27, 1962. The first indictment was returned July 25, 1957, after commitment by a magistrate on August 24, 1956, Criminal No. 29683.

Between the date of the 1956 commitment by the magistrate and February, 1958, defendant twice was examined by a psychiatric commission appointed under R.L.H. 1955, § 258-36[2] (then R.L.H. 1945, § 10826 as amended) in Criminal No. 29244 in which the charge was escape. The first examination was pursuant to a motion made on November 29, 1956 by defendant's court-appointed counsel in the escape case. In response to this motion the court, by an order filed December 12, 1956, appointed a commission consisting of Dr. Robert S. Spencer, who was the "designated psychiatrist of the territorial hos-

[2] "§ 258-36. *Examination as to sanity of person indicted for felony.* Whenever a person has been indicted for a felony by a grand jury, the judge of the court in which such person is to be tried for such offense may, in his discretion, before any trial on the criminal charge, cause such person to be examined by the psychiatrist or any designated psychiatrist of the territorial hospital or the director of the bureau of mental hygiene and by two additional unbiased physicians who in the opinion of the judge are qualified as examiners in insanity, with a view to determine the mental condition of such person and the existence of any mental disease or defect which would affect his criminal responsibility. In every such case such person shall by the order of the court be placed in detention in the territorial hospital or elsewhere as the court may direct for the purpose of such examination for a period of ten days or until completion of such examination if not concluded within the ten days, and the persons so making the examination shall file with the court their written report and opinions thereon, which report shall be accessible to the court, the prosecuting attorney and the attorney for the accused. If the court deems such report conclusive of the then present insanity or mental irresponsibility of the accused, the court may allow a nolle prosequi to be entered in the case, and in such case shall forthwith, without other or further proceedings, adjudge the accused to be insane and commit him to the territorial hospital until discharged as provided by law; or the court may direct the trial of the accused to proceed and in such case the jury shall determine any issue of the then existing or alleged previous mental irresponsibility. The compensation of the physicians making such examination shall be such reasonable sums as are allowed and shall be paid by the county concerned." (As amended and in effect at the time the psychiatric commission was functioning.)

pital," and Drs. Pershing Lo and Richard Kepner. The doctors were directed "to determine whether or not, at the time of the alleged commission of the offense in the above named case, alleged to have been committed on the 1st day of July, 1956, he, the said defendant, was acting under mental derangement, rendering him incompetent to discern the nature and criminality of his acts, and to determine whether or not, at the present time, the said defendant is legally sane, and/or to determine the mental condition of the said defendant and the existence of any mental disease or defect which would affect his criminal responsibility herein." Pursuant to this appointment the commission reported on April 23, 1957:

"As a result of our examinations, observations, and consideration of all available pertinent data, we are of the opinion that, at the time of the alleged commission of the offense in the above-named case, he was not acting under mental derangement rendering him incompetent to discern the nature and criminality of his acts. We are, however, of the opinion that, at the present time, the said defendant is suffering from a major mental illness or, in other words, from a psychotic reaction."

An indictment thereafter having been returned in the murder case defendant was brought before the court on July 26, 1957 and counsel was appointed for him though according to the minutes "defendant stated he did not want counsel." (In the escape case he had requested the court to appoint counsel on November 16, 1956, and counsel had been appointed for him on that day. Different counsel was appointed in the murder case.)

After the appointment of defense counsel in the murder case continuances were sought and allowed on the ground defendant was undergoing electrical treatments. On August 28, 1957 counsel in the murder case was present

at a hearing held in the escape case, at the conclusion of which the court ordered the prosecutor to submit a memorandum "on what the law is as to when a person is of sufficient normal mentality to stand trial." The required memorandum was submitted September 11, 1957, and on September 13, 1957 the State moved for a further examination pursuant to R.L.H. 1955, § 258-36. Thereupon the court appointed the same three doctors as a commission "to determine whether or not, at the present time, the said Defendant is legally sane, and/or to determine whether or not the defendant has the mental capacity to understand the nature and object of the proceedings against him, to comprehend his own condition in reference to such proceedings, and can, with the assistance of his attorney, make a rational defense." This motion and order, like the first ones, were made in the escape case, and the commission made a report therein dated January 14, 1958, filed on or about January 30, 1958, concluding:

"As a result of our examinations, observations, and consideration of all available pertinent data, we are of the opinion that, at the present time, the said Defendant is still suffering from a major mental illness or, in other words, from a psychotic reaction, as was reported by the previous commission to the Honorable W. Z. Fairbanks on April 23, 1957.

"We are therefore of the opinion that, at the present time, this Defendant does not have the mental capacity to understand the nature and object of the proceedings against him, to comprehend his own condition in reference to such proceedings, and to make a rational defense, even with the assistance of his attorney."

On February 20, 1958 the following occurred:

(a) An order was made and entered in the escape case adjudging that the defendant "is now mentally ill" and committing him "to the Territorial Hospital,

there to be detained as an insane person until discharged as provided by law; that prior to being discharged, the Public Prosecutor's Office and the Honolulu Police Department shall be duly notified."

(b) A motion for nolle prosequi was made in each case. In the murder case said motion was "for the reason that James Keawehalu Wong, the defendant above named, in criminal case no. 29244 Territory of Hawaii vs. James Keawehala [sic] Wong, Escape, was adjudged mentally ill, and pursuant to the provisions of Sec. 258-36 Revised Laws of Hawaii, 1955, on the 20th day of February, A.D. 1958 was committed to the Territorial Hospital, there to be detained as an insane person until discharged as provided by law."

(c) A joint hearing was held in the two cases on the motions for nolle prosequi. Each member of the commission was examined. Defense counsel in the murder case was present.

(d) A nolle prosequi was entered in each case.

Thereafter the Attorney General, by a letter of February 25, 1958, advised that under R.L.H. 1955, § 81-12, Oahu Prison might be designated by the Director of Institutions, who was in charge of both the hospital and the prison, as a "special" or "separate" ward of the Territorial Hospital. The record does not show whether such an order was made but does show that defendant remained at the prison, where he was examined by Dr. Christopher Bull on February 27, 1958, shortly after the Attorney General's letter. We will have occasion hereafter to consider in more detail this and other visits made by psychiatric consultants of the Territorial Hospital.

After defendant's discharge from the hospital's rolls on February 27, 1962 and subsequent indictment on May 17, 1962, he retained his present attorneys who, on June 15, 1962, moved to dismiss the indictment on the grounds

of denial of due process and the right to a speedy trial. Defendant asserted unnecessary and unreasonable delay in procuring the indictment and prejudice to the defendant. He relied upon Article I, sections 4 and 11 of the State constitution, the sixth and fourteenth amendments of the Constitution of the United States, and H. R. Cr. P., Rule 48 (b). The fifth ground of the motion was as follows:

"5. Further prosecution of the indictment would violate the fundamental principles of justice and fairness that must be applied even in the case of those charged with the most heinous offenses."

This motion was sustained by a decision of September 10, 1962 and pursuant thereto an order dismissing the indictment was entered September 17, 1962. From that order the State appealed on September 25, 1962, and the first question before us is whether the State had a right of appeal.

On November 21, 1962 defendant moved this court for dismissal of the appeal, contending that the order of September 17, 1962 was not appealable under R.L.H. 1955, § 212-2, which provides for an appeal by the State in a number of instances, of which the following is determinative:

"From an order or judgment, sustaining a special plea in bar, where the defendant has not been put in jeopardy * * *."

After hearing argument on the motion to dismiss we reserved decision and ordered further briefing of the questions involved together with briefing on the merits. Thereafter we set the motion down for reargument in conjunction with argument on the entire case.

In determining whether the order of dismissal was "an order or judgment, sustaining a special plea in bar" we are guided by substance, not form. *United States* v. *Goldman,* 277 U.S. 229, 236, holding that a motion to

dismiss on the ground that it appeared on the face of the information that the prosecution was barred by the statute of limitations was a "special plea in bar" within the meaning of a statute allowing an appeal by the United States from a "decision or judgment sustaining a special plea in bar, when the defendant has not been put in jeopardy"; *United States* v. *Thompson,* 251 U.S. 407, 412, holding that a motion to quash an indictment was a "special plea in bar" when the ground was that the indictment was presented at the instance of the district attorney without prior leave of court after a previous grand jury had considered the matter and had failed to include the charges in question in the indictment it presented; *United States* v. *Oppenheimer,* 242 U.S. 85, 86, holding that a motion to quash an indictment on the ground of a previous adjudication that the prosecution was barred by the statute of limitations, was a plea in bar within the meaning of the above-quoted federal statute; *United States* v. *Barber,* 219 U.S. 72, 78, entertaining an appeal by the United States from a judgment which sustained a "plea in abatement" on the ground the prosecution was barred by the statute of limitations; *United States* v. *Hoffman,* 161 F.2d 881 (D.C. Cir.), certifying to the Supreme Court an appeal by the United States in a criminal contempt proceeding for violation of an injunction, which had been dismissed by the District Court on the ground of immunity of the defendant under the Compulsory Testimony Act, the case being one for direct appeal to the Supreme Court "from a judgment sustaining a special plea in bar"; *United States* v. *Zisblatt,* 172 F.2d 740 (2d Cir.), certifying to the Supreme Court an appeal by the United States from a dismissal of an indictment after verdict of conviction and holding that it was in substance a judgment sustaining a plea in bar (a motion to dismiss the indictment as barred by the statute of limitations having been made before

trial and overruled but subsequently, after verdict, sustained). Further exemplifying this principle is *United States* v. *Hark,* 320 U.S. 531, 536, where the defense was that the price regulation which defendants were charged to have violated had been revoked prior to the indictment, and the district court quashed the indictment. The Supreme Court entertained an appeal by the United States holding:

"\* \* \* The material question is not how the defendant's pleading is styled but the effect of the ruling sought to be reviewed; and we have, therefore, treated a motion to quash, the grant of which would bar prosecution for the offense charged, as a plea in bar within the purview of the statute. The defense here was in bar of the prosecution; to sustain it was to end the cause and exculpate the defendants."

Conversely, in a case of dismissal "with prejudice" because of refusal of the United States to comply with certain orders, the court in *United States* v. *Apex Distributing Co.,* 270 F.2d 747 (9th Cir.), applying the rule that substance not form governs, concluded that defendants could have been reindicted despite the words "with prejudice" had not the statute of limitations run while the motions to dismiss were pending, and held that the judgment therefore was not "in bar," following *United States* v. *Storrs,* 272 U.S. 652. *Cf., United States* v. *Brodson, motion to certify appeal to Supreme Court denied,* 234 F.2d 97, *dismissal reversed* 241 F.2d 107 (7th Cir.).

We find the reasoning of these cases persuasive. *People* v. *Ferguson,* 20 Ill. 2d 295, 299, 170 N.E.2d 171, 173, cited by defendant, is in agreement with these cases, holding that in passing upon the right of the state to appeal "it is the substance which controls, and not the label." *Cf., People* v. *Drymalski,* 22 Ill. 2d 347, 175 N.E.2d 553, *reversing* 28 Ill. App. 2d 479, 171 N.E.2d 671. It further

appears that in Illinois "by statute all defenses are available under the general issue" and "a plea in bar is appropriate in a criminal case only in those instances in which such a plea was permitted at common law." *People* v. *Ferguson, supra,* 170 N.E.2d at 173-74. However, this Illinois rule has to do only with the propriety of a motion in advance of trial. We need not linger on the point, since it could not affect the right to review. Even when a special plea in bar is inappropriate, if it is entertained and sustained the matter is reviewable upon appeal by the state. *United States* v. *Murdock,* 284 U.S. 141; *cf., People* v. *Drymalski, supra,* where the governing statute did not provide for appeal from a judgment sustaining a plea in bar.

Here we have a dismissal ordered under H. R. Cr. P., Rule 48(b). As will appear, we deem this rule inapplicable in the instant case, but that is not significant in passing upon the jurisdictional question—the right of review does not turn upon whether there was or was not error but upon the judgment entered below. *Cf., United States* v. *Thompson, supra,* 251 U.S. 407, 413; *United States* v. *Murdock, supra,* 284 U.S. 141, 147; *United States* v. *Barber, supra,* 219 U.S. 72, 78.

We note that a dismissal under Rule 48(b) may be the equivalent of a nolle prosequi that does not work an acquittal. *Ex parte Altman,* 34 F. Supp. 106, 108 (S.D. Cal.), cited in Advisory Committee's note to Fed. R. Crim. P., Rule 48(b); *Mann* v. *United States,* 304 F.2d 394 (D.C. Cir.). On the other hand a dismissal under Rule 48(b) may be in bar of any further prosecution as exemplified by *Petition of Provoo,* 17 F.R.D. 183 (D. Md.), which was *affirmed sub nom., United States* v. *Provoo,* 350 U.S. 857. Of course the United States Supreme Court would not have had jurisdiction to affirm in *Provoo* had not the dismissal been in bar. In the present case, the State and

the defendant are in agreement that the dismissal, if it stands, bars any further prosecution. Upon consideration of the fifth ground of defendant's motion in the court below[3] and that portion of the decision of September 10, 1962 which, citing *United States* v. *McWilliams*, 163 F.2d 695 (D.C. Cir.), *Petition of Provoo, supra*, 17 F.R.D. 183 (D. Md.), *United States* v. *Gunther*, 259 F.2d 173 (D.C. Cir.), and *Williams* v. *United States*, 250 F.2d 19 (D.C. Cir.), in effect sustains this fifth ground, we find that is the effect of the order of dismissal. We shall review it as such.[4]

We have no occasion to consider the separate paragraph of section 212-2 which provides for an appeal by the State from an order or judgment "quashing, setting aside or sustaining a demurrer to, any indictment or information or any count thereof." This paragraph presents the question whether dismissals not in bar may be appealed by the State when ordered because of matters such as exemplified by *United States* v. *Apex Distributing Co., supra*, 270 F.2d 747 (9th Cir.) ; *United States* v. *Heath*, 260 F.2d 623 (9th Cir.), and *United States* v. *Nardolillo*, 252 F.2d 755 (1st Cir.) (failure or refusal of United States to comply with pre-trial discovery orders) ; *United States* v. *Pack*, 247 F.2d 168 (3d Cir.), and *United States* v. *Janitz*, 161 F.2d 19 (3d Cir.) (failure of United States to go to trial because orders suppressing evidence had "virtually wiped out" the prosecution's evidence). The federal courts, deeming such appeals a back door method of seeking review of nonappealable pre-trial orders, have denied jurisdiction thereover. We note this group of cases because

---

[3] This is set out *supra*, p. 367.

[4] The factors determinative of an application for a dismissal under Rule 48(b) without prejudice to a subsequent prosecution perhaps are not the same as are involved here. In the present case we are concerned with the defendant's right to a dismissal operating as an acquittal.

defendant strongly relies upon *Heath*.

The explanation of *Heath* is to be found in *Apex Distributing Co.*,[5] which followed *Storrs*.[6] It was held in *Storrs* that where the dismissal barred the prosecution because of extrinsic considerations and not because of its nature no plea in bar was involved. "If another indictment cannot be brought that is not because of the judgment on the plea, but is an independent result of a fact having no relation to the plea and working equally whether there was a previous indictment or not." *United States* v. *Storrs, supra,* 272 U.S. at 654. The distinguishing feature here is that the dismissal itself operates as an adjudication that defendant cannot again be prosecuted.

*Territory* v. *Anderson,* 25 Haw. 55 (1919) was decided prior to the 1931 amendments that removed qualifying words under which, to be appealable by the prosecution, a dismissal had to be based either on a special plea in bar or the invalidity or construction of the statute on which the charge was founded.[7] In *Anderson* an indictment having been quashed on the ground that the grand jury previously had acted upon the facts and had returned no bill and the indictment before the court subsequently had been returned without an order of court permitting reconsideration, the prosecution appealed. The court dismissed the appeal, because the attack on the indictment "was based upon the proceedings which took place in the court wherein the indictments were returned * * *." It was concluded this was not in the nature of a special plea in

---

[5] *Supra,* 270 F.2d 747 (9th Cir.).

[6] *Supra,* 272 U.S. 652.

[7] R.L.H. 1955, § 212-2, now provides for an appeal by the State from an order or judgment "quashing, setting aside or sustaining a demurrer to, any indictment or information or any count thereof; * * *" without the limiting words "based upon the invalidity or construction of the statute upon which the indictment or charge is founded," formerly contained in the statute. *Cf.,* R.L.H. 1925, § 2522.

bar. From what was said about the nature of a motion to quash or plea in abatement it appears that the court viewed the attack as akin to such a motion or plea, and as not completely barring the proceeding. The following year the Supreme Court of the United States decided the point involved the other way in *United States* v. *Thompson, supra,* 251 U.S. 407. Which of the two decisions was right on this point is of no interest here. In any event, the basic reasoning of the court in *Anderson* is consonant with the cases above reviewed.

In *Territory* v. *Rituta,* 39 Haw. 522 (1952), the court, without commenting on the jurisdictional aspect, reviewed an appeal taken by the prosecution from a dismissal of an indictment for murder in the first degree, ordered because defendant previously had been indicted for murder in the second degree for the same homicide and was awaiting trial thereon at the time of return of the indictment for murder in the first degree about nine months later. After construing R.L.H. 1945, § 10791, now R.L.H. 1955, § 258-2, the court reversed. The matter clearly was subject to review under the amended statute whether the dismissal was in bar or not.

Of greater interest is *Rex* v. *Tin Ah Chin,* 3 Haw. 90, 96-99 (1869), construing sections 1168 and 1178, Civil Code of 1859, predecessors of S.L. 1876, c. 40, §§ 1 and 3 (Penal Laws of 1897, §§ 615 and 617), which as amended are now R.L.H. 1955, §§ 258-2 and 253-3. The court stated as to the word "acquittal," used in then section 1178, now R.L.H. 1955, § 253-3, which provides that a failure to prosecute under certain circumstances shall "operate as an acquittal": "The position that 'acquittal' here means merely discharge from custody, not preventing another trial for the same offence, is not tenable." 3 Haw. at 98. With the cited sections on the books when R.L.H. 1955, § 212-2 was enacted in 1911 the legislature cannot have

intended any such narrow meaning of the words "special plea in bar" as defendant contends.

A further contention made by defendant in seeking dismissal of the appeal is that, since section 212-2 was enacted before Rule 48(b) was promulgated, a dismissal under the rule cannot have been contemplated as within the scope of the State's right of appeal. But since the operation in bar of a dismissal under Rule 48(b) necessarily is based on some constitutional right which the rule implements, this contention does not merit consideration.

Turning now to a review of the decision of September 10, 1962 we note that the court's findings were based almost entirely on written reports and memoranda of psychiatric consultants of the Territorial Hospital. That hospital since 1959 has been known as the State Hospital, and we will refer to it by that name. Chief emphasis was placed by the court below on the written reports and memoranda of Dr. Christopher Bull, psychiatric consultant of the hospital until August 31, 1959.

The first of Dr. Bull's written reports was dated February 14, 1957. On his next visit, February 28, 1957, Dr. Bull concluded: "It seems quite clear that he is suffering from a schizophrenic psychosis again." But on March 14, 1957 the doctor was unsure "how much of his strange behavior is deliberate deception and how much represents a true mental disease." On March 28, 1957 he stated: "Superficially he is quite bizarre and appears psychotic. On closer evaluation, however, the suspicion remains that the behavior is all on a conscious level and that his peculiar symptoms are simulated." This doubt or suspicion was expressed by Dr. Bull in succeeding reports on April 11, 1957, May 9, 1957, and May 23, 1957. On July 11, 1957 Dr. Bull reported: "He still impresses me as suffering from a hysterical type of mental illness rather than deep-seated malignant type of psychosis." On August 22, 1957

his report stated: "I am by no means convinced that he has the psychotic symptoms he describes * * *." Dr. Bull prescribed a course of treatment which continued until December 31, 1957.

After defendant's commitment on February 20, 1958, Dr. Bull examined him on February 27, 1958, and found him "in better condition than when seen during the past year." The notes of this interview express the doubt previously noted, stating: "He was quite inconsistent when asked whether he considered these symptoms to be real and it was still not completely clear that he experienced or was convinced about these alleged hallucinations."

On April 10, 1958, according to Dr. Bull: "He looked surprisingly well and calm and said things were going along well with him * * *." But on May 8, 1958 the doctor found defendant "rather evasive" and commented: "This reluctance to communicate seems to be rather unrealistic and quite unlike somebody who is recovering from a frightening mental illness. He may, therefore, still be delusional, but he denies any ideas of persecution, any strange experiences or other symptoms of mental disease. He claims he feels well."

On July 3, 1958 Dr. Bull reported: "I am in favor of further observation and have no recommendations to make." On September 4, 1958 he found behavior "quite consistent with the existence of a true mental disease" but further stated: "This is still not an ordinary picture of mental disease. It certainly bears watching, however."

Dr. Bull's last written report was dated November 19, 1958.[8] It was from this report that the court below, after

---

[8] We quote this report of November 19, 1958, in toto:

"This inmate was seen for a routine follow-up visit to check on his adjustment and look for the presence of further psychiatric symptoms. He still maintains his somewhat silly, suspicious, playful attitude, but in general seems to be adjusting very well with no signs of active mental disease.

"He offered no complaints but then mentioned that he has been

finding "that as of November 19, 1958, there was no un-
necessary delay within the meaning of Rule 48(b)" further
found that: "After November 19, 1958, the situation
changes. * * * [T]here was delay attributable to the gov-
ernment in prosecuting defendant on the charge of murder
in the first degree, such delay commencing at least as early
as November 19, 1958, and continuing until May 17, 1962,
a period of 3 years 5 months 28 days."

Defendant was not discharged by the State Hospital
authorities until February 27, 1962. We do not agree with
the conclusion drawn by the court below from the Novem-
ber 19, 1958 report. For reasons hereinafter stated the
report could not be used in the manner in which it was
used by the court below. Moreover, the report must be
read against the background of Dr. Bull's other reports.
This particular psychiatrist had entertained continuous
doubts as to the nature of defendant's mental illness. His
1957 reports were such as to indicate he was not in agree-
ment with the findings of the psychiatric commission. But

---

refused permission to go out for recreation even though he has served
the four months' time without recreation which was required of him
after returning from the incorrigible unit. He wondered whether this
refusal was the result of my recommendations. When it was somewhat
jokingly suggested that perhaps he was kept in because he was con-
sidered an escape risk, he revealed that that is what the Warden im-
plied. He protested, however, that he could escape any day he wanted
to and that, therefore, they should do what they could to make life
more agreeable for him. He then asked why he was not being tried for
the crimes he was charged with. He was told that as a rule people
were not placed on trial if they were thought to be perhaps suffering
from mental disease. He then smiled slightly and asked whether this
meant he would not be punished for acts committed inside the Prison.
When he was assured that he was considered responsible for his actions
here, he pointed out the illogic aspects of this and made somewhat
humorous remarks about not being taken to trial. He complained that
he is not given privileges that other inmates receive and that he is not
given a clear, confident answer when he asks why this is so.

"It may well be that this is disturbing to him, especially if he is
suspicious by nature. It may be helpful to him if he is given clearcut
explanations. In other words, he could be approached like any other
inmate if this is not being done at this time.

"I do not feel that his mental condition would suffer as a result of
this. Although his manner is still somewhat peculiar, he seems to be in
the best condition that I have seen him in many months."

those findings had been accepted by the court on February 20, 1958 and accordingly were conclusive as to defendant's then condition. As stated in *Germany* v. *Hudspeth,* 209 F.2d 15, 19 (10th Cir.) :

"Individual statements or beliefs by different members of the medical staff that [defendant] was sane could not have the force and effect of setting aside a judicial determination of mental incapacity. [Defendant's] mental capacity could thereafter be established only by an orderly proceeding according to law."

*Accord: Connelly* v. *Balkcom,* 213 Ga. 491, 99 S.E.2d 817, 818.

This brings us to the question: When an accused has been committed under section 258-36 and a nolle prosequi entered, what proceedings are contemplated by our statutes in order that he may be restored to competency to stand trial?

The court below did not find in so many words that defendant was competent to stand trial when he was discharged by the State Hospital authorities on February 27, 1962 or when he made his motion for dismissal which, as seen, was tantamount to a motion for acquittal. The court had this to say:

"I find that there has been no change in defendant's mental condition since November 19, 1958, and that *if he was and is mentally competent to stand trial on and after February 27, 1962,* he was equally mentally competent to stand trial on and after November 19, 1958." (Emphasis added.)

And again:

"On the other hand, when the medical director without any special findings discharges an accused who has been committed to the state hospital under Sec. 258-36 or Sec. 258-37, he is only saying, in the language of Sec. 81-36, that the person discharged is not

mentally ill to an extent requiring mental hospital treatment. And even if the medical director's discharge of the accused is interpreted to mean that the accused has sufficient mental capacity to understand the nature and object of the proceedings against him, et cetera, the jury at a subsequent trial under Sec. 258-37 may still find to the contrary.

"In view of Dr. Cody's testimony that he was rather surprised to learn that defendant had been reindicted for murder in the first degree, I am not sure in my own mind whether the psychiatrists at the State Hospital are actually of the opinion that defendant is now mentally competent to stand trial, or whether they only felt that defendant no longer required mental hospital treatment. There is, of course, nothing to prevent defendant from asserting before a jury at a trial of this indictment that he is in fact at the present time mentally incompetent to stand trial."

Defense counsel takes the position that the trial court did in effect find defendant presently, and ever since November 1958, competent to stand trial. Despite our doubts in the matter[9] we shall so read the findings. An acquittal for want of prosecution could not be predicated on a mere finding that defendant's mental condition had been the same since November 1958. A finding that defendant was competent lay at the threshold of the discharge for want of prosecution.

The State contends that it was beyond the province of the trial court to determine defendant's ability to stand trial as of a particular date, arguing: "These are matters which necessarily must be decided by trained and qualified psychiatrists, or a board or a commission consisting

---

[9] Defendant's affidavit attached to his motion merely averred "that at all times since about 1958 he has been in the same mental condition as of the date of the indictment herein * * *."

of such persons," the State at the same time conceding "it is true that the lower court may decide and act upon recommendations and reports submitted by such psychiatrists * * *." The State further contends that discharge from the hospital was a condition precedent to any renewal of the criminal proceedings, citing *Germany* v. *Hudspeth, supra,* 209 F.2d 15 (10th Cir.), and *People* v. *Ashley,* 59 Cal. 2d 339, 379 P.2d 496.

As seen, defendant was committed in February 1958 under section 258-36. That statute provides that upon acceptance of a report of a psychiatric commission showing "present insanity or mental irresponsibility of the accused" the court "shall forthwith, without other or further proceedings, adjudge the accused to be insane and commit him to the state hospital until discharged as provided by law * * *." R.L.H. 1955, § 258-37, relating to a jury finding of incompetency, provides for commitment of the accused "until discharged according to law."

As noted by the court below, there are variations in language in these statutes, *e.g.,* "mental condition," "mental disease or defect which would affect his criminal responsibility," "insanity," "mental irresponsibility," "insane," "insane person." We note also that as pointed out by the court below the standard for discharge from the State Hospital is set by R.L.H. 1955, § 81-36, as amended (1961 Supp.), and is "that such person [the person ordered to be hospitalized] is not mentally ill to an extent requiring mental hospital treatment." As held in *Durham* v. *United States,* 237 F.2d 760, 761 (D.C. Cir.), "competency to stand trial is entirely different from such soundness of mind as would warrant discharge from the hospital." Nevertheless the legislature has equated the two to the extent of requiring that a person adjudicated not competent to stand trial obtain his discharge from the mental hospital before he goes at large. That means that

once a person is committed as not competent, incarceration is deemed necessary until he is discharged. Section 81-36 further provides: "Any such discharge of a person who was ordered to be hospitalized at the hospital as a mentally ill person shall be prima facie evidence of the good mental health of such person when so discharged." But so long as the person committed is legally incarcerated the prosecutor is not on notice of any change in the condition which caused the original commitment. That may leave a question, in some cases, as to the responsibility of the prosecutor to keep informed as to such person's competency. For reasons hereinafter stated, this case is not governed by the answer to that question.

We do not agree with the State's position that discharge from the hospital was an absolute condition precedent to any renewal of the criminal proceedings. Our statute differs materially from the statutes set out or summarized in *Germany* v. *Hudspeth* and *People* v. *Ashley, supra.* Nor do we agree with the State's contention that the trial court could make no finding as to defendant's ability to stand trial on a particular date without first receiving the recommendations of psychiatrists. This contention is too broad. A trial court has discretion as to whether a psychiatric examination shall be ordered. *Territory* v. *Gaudia,* 41 Haw. 213. Whether a judge, without ordering a psychiatric examination and without submission of the issue to a jury, may adjudge a defendant not competent to stand trial is not before us. It is clear that the trial judge has the power to find a defendant competent without psychiatric examination, subject to jury determination of the same issue.

However, the point remains that the prosecutor was not on notice of any restoration to competency. We cannot agree with the court below that the hospital psychiatrists "were as much a part of the prosecuting process

as the prosecuting attorney." It was the conclusion of the court below that: "It will not do to say that the office of the public prosecutor (now prosecuting attorney) could do nothing except to await the doctors. The government cannot evade responsibility by dividing it among different officers. * * * The director of the hospital and the prosecuting attorney had a joint responsibility to keep informed as to the mental competency of the defendant to stand trial."

The director of the hospital had no responsibility as to the competency of the defendant to stand trial. His responsibility was to discharge him when and if "not mentally ill to an extent requiring mental hospital treatment." R.L.H. 1955, § 81-36, as amended (1961 Supp.). Such a discharge, coming not immediately but after a period of time, would indicate some significant change of condition, and the prosecutor so regarded the matter when the discharge was made. Meanwhile, defendant himself could have applied for his discharge as provided by R.L.H. 1955, § 81-36, *supra*. We are in complete agreement with *People* v. *Ashley, supra,* 59 Cal. 2d 339, 379 P.2d 496, 508, that the time when defendant should have been discharged is not to be determined upon an application for dismissal for delay in prosecution. Defendant could have made a frontal attack on the commitment itself. In such a proceeding Dr. Bull's November 19, 1958 report would have had weight. In this proceeding it is not permissible to date the time when competency was restored back to the date of that report.

The court below found that "defendant did nothing to prolong his own hospitalization so as to delay trial * * * and did not waive any rights he may have or may have had to a 'speedy trial.' " The court was of the opinion that when defendant asked Dr. Bull why he was not being tried as reported by Dr. Bull on November 19, 1958 "this con-

stituted a request for a speedy trial under the circumstances." Further, the court was of the view: "Defendant cannot be expected to express himself in technical terms."

There is not the slightest evidence that defendant sought his discharge or trial. He evidently was aware that his status as a State Hospital patient was shielding him from trial—so much may be gleaned from the November 19, 1958 report.[10] The further inference from that report is that he sought broader protection from the same shield. "He * * * mentioned that he has been refused permission to go out for recreation * * *. He then asked why he was not being tried for the crimes he was charged with. He was told that as a rule people were not placed on trial if they were thought to be perhaps suffering from mental disease. He then smiled slightly and asked whether this meant he would not be punished for acts committed inside the Prison. * * *" Nothing herein suggests that he sought to set aside the shield.

Dr. George Ponomareff succeeded Dr. Bull in the fall of 1959. Along with oral reports he made a written report, dated March 24, 1960, in which he stated: "Evaluation of his mental status was difficult because of his unwillingness to enter into a conversation. However, although he denied hallucinations in recent months he admits that he stays away from the other prisoners because he thinks they are somehow against him."

On December 22, 1960, Dr. Ponomareff in evident confusion as to the legal background of defendant's listing on the State Hospital rolls addressed the warden asking if defendant might be "transferred back to simple prisoner status." However, a copy went to the hospital and two months later, according to Dr. William Cody, Medical Administrator of the hospital, Dr. John Wright, who was Chief of the Men's Service and was one of the psychiatrists

___

10 This report is set out in n. 8, *supra*.

who saw defendant at the prison from time to time, wrote the warden that an examination should be performed to see if defendant could be discharged from the hospital. Dr. Wright left the service in the summer of 1961. Dr. Ponomareff left in the fall of 1961. Both have left the State, as has Dr. Bull.

Dr. Joseph Finney took over some time after Dr. Ponomareff left. On November 20, 1961 he made a written report indicating a complete review of defendant's record. Of his interview with defendant, Dr. Finney wrote: "He was on the whole hostile and evasive * * *. He would neither admit nor deny whether he is hearing voices at the present time. His only comment is, 'I am feeling fine,' but he refuses to specifically deny hearing voices." Dr. Finney wrote further: "In summary this is a very bitter, hostile man * * *. It is impossible to say whether or not he has now or has ever had any psychotic symptoms. He was very uncooperative * * *."

In December 1961, Dr. Cody asked for a recommendation regarding a possible discharge and Dr. Finney again interviewed defendant. The following significant paragraph appears in this report:

"I explained the purpose of the interview to him, and asked what opinion or recommendation he might have about his being discharged from the rolls of the Hawaii State Hospital and with regard to whether or not he was insane. He replied rather insolently that it was up to me to determine that and that he did not intend to help me reach a decision. His answers to many of my questions were very very irritating."

Dr. Finney concluded: "In my opinion this man is not insane or psychotic or mentally ill. I think he has a severe neurotic problem * * *." Dr. Finney recommended "that he be discharged from the rolls of Hawaii State Hospital," and added: "This man is not insane, though there is a

possibility that he might succeed in faking insanity if he felt it was to his advantage to do so in the course of a trial." Defendant's discharge followed on February 27, 1962.

It may well be that defendant would have been discharged early in 1961 had there been a prompt follow-up on Dr. Ponomareff's December 22, 1960 communication to the warden. He might even have been discharged at the end of 1958 had Dr. Bull seen fit to recommend it. But that is beside the point. Defendant did not seek his discharge and the prosecutor was not on notice that his condition had changed.

The trial court recognized that: "The rights protected by the rule [H. R. Cr. P., Rule 48(b)] are personal to the defendant and may be waived if not properly asserted." This is the federal rule. Many cases are cited in *Petition of Provoo, supra,* 17 F.R.D. 183, 198, note 19, *aff'd,* 350 U.S. 857. *Accord: Harlow* v. *United States,* 301 F.2d 361, 367 (5th Cir.) ; *United States* v. *Van Allen,* 288 F.2d 825 (2d Cir.) ; *Turberville* v. *United States,* 303 F.2d 411, 415 (D.C. Cir.) ; *United States* v. *Patrisso,* 21 F.R.D. 363 (S.D.N.Y.) ; *Gordon* v. *Overlade,* 143 F. Supp. 577 (N.D. Ind.).

Under some state statutes imposing a duty upon the prosecution to proceed within a specified time, the conclusion has been reached that the defendant is not under the necessity of asserting his rights and is entitled to his discharge under the statute, as illustrated by *State* v. *Chadwick,* 150 Ore. 645, 47 P.2d 232. On the other hand, as noted in *United States* v. *Cadarr,* 197 U.S. 475, under some state statutes failure of the prosecution to proceed within the specified time does not work a final discharge from the offense. Annot., 50 A.L.R.2d 943. Some state courts, despite a statute providing for prosecution within a designated time, follow the federal rule and require that de-

fendant assert his right to a speedy trial or he will be held to have waived it, as illustrated by *McCandless* v. *District Court*, 245 Iowa 599, 61 N.W.2d 674. Others decline to follow the federal rule, *e.g., Hicks* v. *People*, 148 Colo. 26, 364 P.2d 877.

We have no statute applicable to the time within which an indictment must be obtained. *Territory* v. *Shito*, 43 Haw. 203, 204; *Territory* v. *Rituta, supra*, 39 Haw. 522. The federal decisions may and should be followed. Article I, section 11, of the State constitution[11] was modeled after the sixth amendment and was intended to incorporate it and to give the State the benefit of federal decisions construing the same language. Standing Committee Report No. 20 of the Committee on Bill of Rights of the Constitutional Convention (Proceedings of the Constitutional Convention, Vol. I at 164); Committee of the Whole Report No. 5 (*id.* at 302). We shall consider the State constitution's provision in the light of the federal decisions. *Cf., State* v. *Pokini*, 45 Haw. 295, 308, 367 P.2d 499, 506, where the search and seizure provision was involved.

It was noted in *Territory* v. *Shito, supra*, that most of the federal cases concern post-indictment delay but similar considerations apply in determining whether there has been unnecessary pre-indictment delay. Thus, in *United States* v. *Kabot*, 185 F. Supp. 159 (S.D.N.Y.) it was held that one who made no objection to repeated adjournments of the preliminary hearing was not entitled to dismissal of the indictment when returned without a preliminary hearing since he had means, through objections to the adjournments and by motion for his discharge, to make what would have been, under the particular circumstances, the equivalent of a demand for a speedy trial. So here, if we were to accept the trial court's view that

---

[11] "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial * * *."

the prosecution was pending notwithstanding the nolle prosequi entered on February 20, 1958, we would agree that Rule 48 (b) applied to implement the sixth amendment and Article I, section 11 of our constitution, and that a question of pre-indictment delay accordingly was presented. However, we at the same time would take cognizance that the prosecutor was not on notice of a change in defendant's condition, that if defendant became competent in late 1958, as the trial court decided, he had it in his power to "flush the duck" by applying for his discharge from the State Hospital, and that he did not choose to do so though aware that his status as a mental patient was the reason he was not being tried. Under these circumstances the trial court's view as to the responsibility of the prosecutor to keep informed as to defendant's competency is not consonant with the rule that defendant himself must seek a speedy trial.

But we cannot agree with the holding of the court below that the prosecution was pending and was within the coverage of Rule 48 (b) and the sixth amendment and Article I, section 11 of the State constitution notwithstanding the nolle prosequi entered on February 20, 1958. That nolle prosequi had precisely the same effect as those considered in *Territory* v. *Fullerton,* 16 Haw. 526. It ended the pending prosecution but did not bar a subsequent prosecution. 14 Am. Jur., *Criminal Law,* § 295; *Barrett* v. *State,* 155 Md. 636, 142 Atl. 96; *State* v. *Veterans of Foreign Wars,* 223 Iowa 1146, 274 N.W. 916, 112 A.L.R. 383 (annotated); *Dortch* v. *United States,* 203 F.2d 709 (6th Cir.); *Spriggs* v. *United States,* 225 F.2d 865 (9th Cir.). When nolle prosequis were entered on February 20, 1958 in the two cases, Criminal Nos. 29244 and 29683, defendant was in a position to receive and thereafter did receive the benefit of the bar of the statute of limitations in the escape case, Criminal No. 29244. In the murder

case, Criminal No. 29683, there was no applicable statute of limitations but the nolle prosequi had the effect of terminating the pending prosecution in each of the cases in the same way.

In the interim between the termination of the prosecution for the murder that commenced in 1956 with a commitment by the magistrate, and the subsequent prosecution for the same offense commenced by the May 17, 1962 indictment, no question under Rule 48(b) or the sixth amendment or Article I, section 11 of the State constitution, could possibly arise. *Cf., Territory* v. *Fullerton, supra; People* v. *Godlewski,* 22 Cal. 2d 677, 140 P.2d 381. This is because the cited provisions have no application to delay occurring when there is no pending prosecution. *Nickens* v. *United States,* 323 F.2d 808 (D.C. Cir.); *Harlow* v. *United States, supra,* 301 F.2d 361, 366 (5th Cir.); *Hoopengarner* v. *United States,* 270 F.2d 465, 469 (6th Cir.); *Venus* v. *United States,* 287 F.2d 304 (9th Cir.); *D'Aquino* v. *United States,* 192 F.2d 338 (9th Cir.); *cf., People* v. *Thomas,* 409 Ill. 473, 100 N.E.2d 588; see *Territory* v. *Shito, supra,* 43 Haw. 203, 207, citing *Parker* v. *United States,* 252 F.2d 680 (6th Cir.); but see *Taylor* v. *United States,* 238 F.2d 259 (D.C. Cir.), and as to Rule 48(b) see *Foley* v. *United States,* 290 F.2d 562 (8th Cir.).

Defendant contends that when section 258-36 is read with section 258-37 it appears that the nolle prosequi entered here was not the usual one. Under section 258-37, when competency of a defendant to stand trial is submitted to a jury and the jury finds incompetency, the finding may be recorded and defendant committed "subject to a prosecution for the offense or discharge upon the termination of the insanity." Consideration of section 258-37 gives rise to the question whether entry of a nolle prosequi is a necessary accompaniment of an adjudication of incompetency made by the court without a jury under

section 258-36. That section says that the court "may" allow a nolle prosequi to be entered. At all events, after consideration of sections 258-36 and 258-37 and section 1-21, relating to the construction of statutes in pari materia, we have concluded that the nolle prosequi provided for by section 258-36, when entered, has the usual consequence of terminating the pending prosecution without eliminating the possibility of a subsequent prosecution. Moreover, the nolle prosequi entered in Criminal No. 29683, the murder case, was the ordinary one moved by the prosecutor and entered by leave of court; despite some confusion in the minutes the conclusion to be drawn from the record is that the report of the psychiatric commission and the commitment were made and ordered in Criminal No. 29244, the escape case, and not in the murder case.

This disposes of the contentions of unnecessary and unreasonable delay and denial of the right to a speedy trial, but leaves for consideration the question of due process. In an affidavit attached to his motion defendant averred:

"Defendant is being denied due process of law in that he cannot, more than five years after having been found lacking the mental capacity to defend himself, however responsible for his acts on July 1, 1956, obtain psychiatric testimony from a doctor of his choice as to the accuracy of the findings of years ago. In that regard defendant is informed a doctor would need a description and explanation of the origin, development and manifestations of the alleged disease, how it occurred, developed and affected the mental and emotional processes of defendant. Furthermore, it would be impossible for a psychiatrist of defendant's choosing at this late date to make a finding, assuming agreement with the three court appointed doctors that at the time

of their examinations defendant was suffering from a major mental illness, whether in his expert opinion the three court appointed doctors were able to state with reasonable medical certainty, based on the facts of record at the time of their examination and their observations, that defendant was not suffering from a major mental illness and incompetent on July 1, 1956." At the argument defense counsel strongly urged that defendant's motion in the court below was supported by this paragraph and *Williams* v. *United States, supra,* 250 F.2d 19 (D.C. Cir.).

We know of no rule guaranteeing that a defendant who is found incompetent when first arraigned will be able, when brought to trial, to employ a psychiatrist of his own choosing to evaluate the findings of the court-appointed psychiatric commission without any obstruction due to the passage of time. Furthermore, the affidavit contains nothing more than the bald assertion that it is too late to evaluate the psychiatric commission's work. The depth and extent of the psychiatric commission's examinations have not even been probed. Viewed in the light of our holding that if there was unnecessary delay defendant himself was at fault, defendant's argument is tantamount to a contention that long continued delay incident to an adjudication of incompetency *ipso facto* discharges a defendant from prosecution. Such is not the law. *Cf., State* v. *Theard,* 203 La. 1026, 14 So. 2d 824.

The court below found prejudice to the defendant after noting: "Dr. Bull seems obviously to be in the best position to testify as to defendant's probable mental condition on July 7, 1956. But Dr. Bull is not here. Neither are Drs. Ponomareff or Wright." At the argument defense counsel conceded that the deposition of Dr. Bull (to which the questioning was directed as chief emphasis was placed by the court below on Dr. Bull's knowledge of defendant's

mental condition) could be taken on motion of defendant under H. R. Cr. P., Rule 15. So far as appears the same is true as to Drs. Ponomareff and Wright. Dr. Finney and the three members of the psychiatric commission are available.

In *Williams* the majority of the court was of the view that irrespective of the fault for the delay, where the prosecution had "not only failed to take any steps to ascertain the facts which would determine appellant's mental condition as it bore upon guilt or innocence, but resisted every defense attempt to produce those facts"[12] appellant's conviction must be reversed. As held in *United States* v. *Banmiller,* 179 F. Supp. 390 (E.D. Pa.) the holding in *Williams* was due to the special circumstances there present.

Here the psychiatric commission first was appointed in 1956, and was given ample time to determine defendant's mental condition. Their examination went into defendant's mental condition in July 1956,[13] as well as his present competency to stand trial. There is nothing in the record that suggests they were hampered by any lack of information as to defendant's history or by any want of facilities to make an adequate examination. The facts are unlike those in *Williams.*[14]

On the present record there is nothing to show that the manner in which the case has been handled has deprived defendant of a fair trial. The contention of denial

---

[12] 250 F.2d at 24.

[13] We note that the psychiatric examination was made in the escape case and related to defendant's mental condition on July 1, 1956. The alleged murder occurred July 7, 1956. Defense counsel did not move for a psychiatric examination in the murder case. No point has been made here as to the difference in the dates of the two offenses. No point was made of it in defendant's motion.

[14] Defense counsel argues that the psychiatric commission, appointed December 12, 1956, did not see defendant until at least five months after the murder. Our statute does not provide for appointment of such a commission until the accused has been indicted.

of due process has not been sustained. It is purely speculative. *Cf., United States* v. *Brodson, supra,* 241 F.2d 107 (7th Cir.).

Reversed and remanded for further proceedings.

*Herbert H. Tanigawa,* Deputy Prosecuting Attorney, City and County of Honolulu (*John H. Peters,* Prosecuting Attorney with him on the briefs) for the State, appellant.

*Hideki Nakamura* and *Myer C. Symonds* (*Bouslog & Symonds* on the brief) for defendant, appellee.